**23-11197**

# United States Court of Appeals

### *for the*

# Eleventh Circuit

———————◆———————

FEDERAL TRADE COMMISSION,

*Plaintiff/Appellee,*

— v. —

BURTON KATZ, *et al.*,

*Defendants/Appellants.*

————————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO: 1:19-cv-25046-RNS
(Hon. Robert N. Scola, Jr.)

## OPENING BRIEF OF BURTON KATZ AND BRENT LEVISON

MARLON J. WEISS
ARMSTRONG TEASDALE LLP
355 Alhambra Circle, Suite 1250
Coral Gables, Florida 33134
Telephone: (305) 371-8809
Facsimile: (305) 448-4155
mweiss@atllp.com
miamiefiling@atllp.com

*Counsel for Defendants/Appellants*

CP  **COUNSEL PRESS** • VA – (804) 648-3664

*Federal Trade Commission v. Burton Katz, et al.*

No. 23-11197

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to Eleventh Circuit Rule 26.1-1, Appellants hereby certify that the following have an interest in the outcome of this appeal:

714 Media Ltd. (Defendant).

A1 Passport & Visa LLC (Subsidiary of Panther Media LLC).

Any Case S.A. (Subsidiary of On Point Global LLC).

Armstrong Teasdale LLP (Counsel for Defendants-Appellants Burton Katz and Brent Levison).

Baker & Hostetler LLP (Former Counsel for Defendants Burton Katz, Brent Levison, Elisha Rothman, Christopher Sherman, On Point Global LLC, On Point Global Employment LLC, On Point Guides LLC, DG DMV LLC, On Point Domains LLC, Final Draft Media LLC, Cambridge Media Series LLC, Issue Based Media LLC, Bella Vista Media Ltd., Carganet S.A., Direct Market LLC, Bluebird Media LLC, Borat Media LLC, Bring Back the Magic Media LLC, Chametz Media LLC, Chelsea Media LLC, Coinstar Media LLC, Domain Development Studios LLC, Domain Dividends Media LLC, Eagle Media LLC, Falcon Media LLC, GNR Media LLC, Island Media LLC, Leatherback Media

*Federal Trade Commission v. Burton Katz, et al.*
No. 23-11197

Group LLC, Macau Media LLC, CEG Media LLC, MBL Media Ltd. Inc., Orange and Blue Media LLC, Orange Grove Media LLC, Panther Media LLC, Pirate Media LLC, Pivot Media Group LLC, PJ Groove Media LLC, Sandman Media Group LLC, Shadow Media LLC, Skylar Media LLC, Slayer Billing LLC, Spartacus Media LLC, Very Busy Media LLC, Wasabi Media LLC, Yamazaki Media LLC, Bronco Family Holdings LP, BAL Family LP, Cardozo Holdings LLC, 714 Media Ltd., Mac Media Ltd., License America Management LLC, License America Holdings LLC and Blackbird Media LLC).

BAL Family LP (Defendant).

Baluga, Ramiro (Partial ownership interest in Carganet S.A.).

Bella Vista Media Ltd. also d/b/a BV Media (Defendant).

Blackbird Media LLC (Defendant).

Bluebird Media LLC (Defendant).

Boies Schiller Flexner LLP (Counsel for Defendants Robert Zangrillo, Dragon Global LLC, Dragon Global Management LLC, Dragon Global Holdings LLC, and On Point Capital Partners LLC).

Borat Media LLC      (Defendant).

Bring Back the Magic Media LLC (Defendant).

*Federal Trade Commission v. Burton Katz, et al.*
No. 23-11197

Bronco Family Holdings LP a/k/a Bronco Holdings Family LP (Defendant).

Bronco Management Ltd. (Partial ownership interest in Bronco Family Holdings LP).

Cambridge Media Series LLC f/k/a License America Media Series LLC (Defendant).

Campbell, Patrick T. (Former Counsel for Defendants).

Cardozo Holdings LLC (Defendant).

Carganet S.A. also d/b/a G8 Labs (Defendant).

Cartier, Nicholas (Counsel for Plaintiff-Appellee Federal Trade Commission).

CEG Media LLC f/k/a Matzoh Media LLC (Defendant).

Chametz Media LLC (Defendant).

Chaudry, Sana (Counsel for Plaintiff-Appellee, Federal Trade Commission)

Chelsea Media LLC (Defendant).

Claro Market (Subsidiary of On Point Global LLC).

Cohen, Jonathan (Counsel for Plaintiff-Appellee Federal Trade Commission).

Coinstar Media LLC (Defendant).

*Federal Trade Commission v. Burton Katz, et al.*
No. 23-11197

Damian, Melanie Emmons (Counsel for Defendant On Point Global LLC).

Damian & Valori LLP (Counsel for Defendant On Point Global LLC).

DeLaquil, Mark W. (Former Counsel for Defendants).

DG DMV LLC (Defendant).

DG On Point LLC (Shareholder of On Point Global LLC).

Dimond, Scott Michael (Counsel for Defendants On Point Capital Partners LLC, DG DMV LLC, Cambridge Media Series LLC, Issue Based Media LLC, Bella Vista Media Ltd., Carganet S.A., Direct Market LLC, Bluebird Media LLC, Borat Media LLC).

Dimond Kaplan & Rothstein PA (Counsel for Defendants On Point Capital Partners LLC, DG DMV LLC, Cambridge Media Series LLC, Issue Based Media LLC, Bella Vista Media Ltd., Carganet S.A., Direct Market LLC, Bluebird Media LLC, Borat Media LLC).

Direct Market LLC (Defendant).

Domain Development Studios LLC (Defendant).

Domain Dividends Media LLC (Defendant).

Donaho, Thomas (Former Counsel for Defendants).

Dragon Global Holdings LLC    (Defendant).

*Federal Trade Commission v. Burton Katz, et al.*
No. 23-11197

Dragon Global LLC (Defendant).

Dragon Global Management LLC (Defendant).

Durkin, Denis Lawrence (Former Counsel for Defendants).

Eagle Media LLC (Defendant).

Erickson, Christopher J. (Counsel for Plaintiff-Appellee Federal Trade Commission).

Falcon Media LLC (Defendant).

Federal Trade Commission (Plaintiff-Appellee).

Final Draft Media LLC (Defendant). This entity has been dissolved and no longer exists.

Fokas, Jimmy (Former Counsel for Defendants).

Franco, Xavier A. (Counsel for Defendants Arlene Mahon and Waltham Technologies LLC).

GNR Media LLC (Defendant).

Goldstein, Linda A. (Former Counsel for Defendants).

Genet, Solomon Brauner (Counsel for Defendants).

Grossman, Bradley (Counsel for Plaintiff-Appellee Federal Trade Commission)

Island Media LLC (Defendant).

Issue Based Media LLC (Defendant).

*Federal Trade Commission v. Burton Katz, et al.*

No. 23-11197

Kaplan, Justin Brett (Counsel for Defendant Waltham Technologies LLC).

Katz, Burton (Defendant-Appellant).

Katz, Marjan (Partial ownership interest in Bronco Family Holdings LP).

Kelly, Meghan Rohling (Former Counsel for Defendants).

Knudsen, Renee M. (Counsel for Defendants).

Leatherback Media Group LLC (Defendant).

Levison, Brent (Defendant-Appellant).

License America Holdings LLC (Defendant).

License America Management LLC (Defendant).

Louis, Marshall Dore (Counsel for Defendants Robert Zangrillo, Dragon Global LLC, Dragon Global Management LLC, Dragon Global Holdings LLC, and On Point Capital Partners LLC).

Lussich, Juan (Partial ownership interest in Carganet S.A.).

Lyster, Lauren P. (Former Counsel for Defendants).

Mac Media Ltd. (Defendant).

Macau Media LLC (Defendant).

Mahon, Arlene (Defendant).

*Federal Trade Commission v. Burton Katz, et al.*
No. 23-11197

Mariela, Sabina (Counsel for Defendant On Point Capital Partners LLC, Dragon Global LLC, Dragon Global Management LLC, Dragon Global Holdings LLC).

Martino, Jeffrey D. (Former Counsel for Defendants).

MBL Media Ltd. Inc. (Defendant).

McArdle Perez & Franco, PL (Counsel for Defendants Arlene Mahon and Waltham Technologies LLC).

Meland Budwick, P.A. (Counsel for Defendants-Appellants Brent Levison, Burton Katz, and Former Counsel for Defendants Christopher Sherman, and Elisha Rothman).

Mila Bear LLC (Partial ownership interest in BAL Family LP).

Moon, James C. (Counsel for Defendants-Appellants Brent Levison and Burton Katz, and Former Counsel for Defendants Christopher Sherman, and Elisha Rothman).

Murena, Kenneth Dante (Counsel for Defendants On Point Capital Partners LLC, DG DMV LLC, Cambridge Media Series LLC, Issue Based Media LLC, Bella Vista Media Ltd, Carganet S.A., Dragon Global LLC, Dragon Global Holdings LLC, Direct Market LLC, Bluebird Media LLC, Borat Media LLC).

*Federal Trade Commission v. Burton Katz, et al.*

No. 23-11197

Nelson Mullins Riley Scarborough, LLP (Counsel for Defendant Waltham Technologies LLC).

New, Jonathan B. (Former Counsel for Defendants).

On Point Aggregator LLC (Shareholder of On Point Global LLC).

On Point Brasil (Subsidiary of On Point Global LLC).

On Point Capital Partners LLC (Defendant).

On Point Digital (Subsidiary of On Point Global LLC).

On Point Domains LLC (Defendant).

On Point Employment LLC (Defendant).

On Point Global LLC (Defendant).

On Point Guides LLC f/k/a Rogue Media Services LLC (Defendant).

On Point Platforms, LLC (Subsidiary of On Point Global LLC).

On Point Processing, LLC (Subsidiary of On Point Global LLC).

Orange and Blue Media LLC (Defendant).

Orange Grove Media LLC (Defendant).

Oxley, William W. (Former Counsel for Defendants).

Pache, Carlos (Partial ownership interest in Carganet S.A.).

Pacmarc (Subsidiary of On Point Global LLC).

Panther Media LLC (Defendant).

*Federal Trade Commission v. Burton Katz, et al.*
No. 23-11197

PBJ Media (Subsidiary of On Point Global LLC).

Pirate Media LLC (Defendant).

Pivot Media Group LLC (Defendant).

PJ Groove Media LLC (Defendant).

Process China (Subsidiary of Panther Media LLC).

Pruss, Lorenz Michel (Counsel for Defendant Carganet S.A., Direct Market LLC, Bluebird Media LLC, Borat Media LLC).

Raile, Richard B. (Former Counsel for Defendants).

Reseins (Partial ownership interest in Domain Dividends Media LLC).

Resnick, Andrew (Partial ownership interest in Pivot Media Group LLC).

Rivkin, Jr., David B. (Former Counsel for Defendants).

Rothman, Elisha (Defendant).

Rothstein, David Alan (Counsel for Defendants On Point Capital Partners LLC, DG DMV LLC, Cambridge Media Series LLC, Issue Based Media LLC, Bella Vista Media Ltd, Carganet S.A., Direct Market LLC, Bluebird Media LLC, Borat Media LLC).

Rugusci, Francisco (Partial ownership interest in Carganet S.A.).

*Federal Trade Commission v. Burton Katz, et al.*
No. 23-11197

Sandman Media Group LLC (Defendant).

Schwartz, Matthew L. (Counsel for Defendants Robert Zangrillo, Dragon Global LLC, Dragon Global Management LLC, Dragon Global Holdings LLC, and On Point Capital Partners LLC).

Scola, Jr., Robert N. (District Judge).

Shadow Media LLC (Defendant).

Sherman, Christopher (Defendant).

Skylar Media LLC (Defendant).

Slayer Billing LLC (Defendant).

Sowell, Robert Douglas (Former Counsel for Defendant

Spartacus Media LLC (Defendant).

The BAL Revocable Trust (Partial ownership interest in BAL Family LP).

The Elisha Rothman 2014 Irrevocable Dynasty Trust (Partial ownership interest in Mac Media Ltd).

Thielhelm, Jr., Robert William (Former Counsel for Defendants).

Torres, Edwin G. (Magistrate Judge).

Very Busy Media LLC (Defendant).

Waldrop, Sarah (Counsel for Plaintiff/Appellee Federal Trade Commission)

*Federal Trade Commission v. Burton Katz, et al.*

No. 23-11197

Waltham Technologies LLC (Defendant).

Waly Rain Corp. (Subsidiary of On Point Brasil).

Wasabi Media LLC (Defendant).

Weiss, Marlon J. (Counsel for Defendants-Appellants Burton Katz and Brent Levison).

Winik, Sara K. (Former Counsel for Defendants Robert Zangrillo, Dragon Global LLC, Dragon Global Management LLC, Dragon Global Holdings LLC, and On Point Capital Partners LLC).

Yamazaki Media LLC (Defendant).

Yeah S.A. (Subsidiary of On Point Global LLC).

Zach, John T. (Counsel for Defendants Robert Zangrillo, Dragon Global LLC, Dragon Global Management LLC, Dragon Global Holdings LLC, and On Point Capital Partners LLC).

Zangrillo, Robert (Defendant).

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-3(b), Appellants certify that none of the corporate entities listed above are publicly held.

/s/ Marlon J. Weiss
Marlon J. Weiss

*Attorney for Defendants-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

Appellants submit that oral argument would be helpful to the Court. This matter is complex, and the procedural history is extensive. Furthermore, this appeal involves novel issues with potentially wide-ranging effect.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT .........................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ............................... i

TABLE OF CONTENTS ................................................... ii

TABLE OF AUTHORITIES ...............................................iv

STATEMENT OF JURISDICTION .................................... 1

INTRODUCTION ......................................................... 2

STATEMENT OF THE ISSUES ...................................... 6

STATEMENT OF THE CASE ......................................... 7

    A.   The Parties and their Business...................................... 7

    B.   The *Acquinity* Action ...................................... 9

    C.   The *On Point* Action..................................... 11

    D.   *AMG* and its Aftermath.................................. 13

    E.   Summary Judgment Evidence.................................... 16

    F.   Summary Judgment Rulings....................................... 33

        1.   Summary Injunction........................................... 33

        2.   Summary Contempt............................................ 35

    G.   Trial on Damages ....................................... 36

    H.   Claims Process and Current Status of Receivership ..... 37

I.    Standard of Review ...................................................... 40

SUMMARY OF THE ARGUMENT ................................................... 41

ARGUMENT .................................................................. 43

I.    The FTC Has No Statutory Authority to Obtain Compensatory Contempt Damages............................. 43

II.   The District Court Erred in Awarding Gross Receipts, and Freemium Damages, Jointly and Severally ............ 50

III.  The District Court Erred in Granting Summary Judgment.................................................... 54

      A.    Deception Was Materially Disputed...................... 55

      B.    The *Acquinity* Injunction Was Invalid and Unlawful ............................................. 65

      C.    Ability to Comply Was Materially Disputed........... 68

      D.    Levison Lacked Actual Notice of the *Acquinity* Injunction .......................................... 70

      E.    Judicial Reassignment is Warranted ................... 73

CONCLUSION ................................................................ 75

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

\* *AMG Capital Mgmt., LLC v. FTC*,
   141 S. Ct. 1341 (2021) ....................................................... *passim*

*AMG Capital Mgmt. v. FTC*,
   2019 WL 6840723 (U.S. 2019) ............................................. 13-14

*Atl. Sounding Co. v. Townsend*,
   496 F.3d 1282 (11th Cir. 2007)................................................. 52

*Beardsall v. CVS Pharmacy, Inc.*,
   953 F.3d 969 (7th Cir. 2020)..................................................... 64

*Blanco GmbH±Co. KG v. Vlanco Indus., LLC*,
   992 F. Supp. 2d 1225 (S.D. Fla. 2014), *aff'd sub nom.*,
   *Blanco GmbH %8F Co. KG v. Laera*,
   620 F. App'x 718 (11th Cir. 2015)............................................. 70

*Burton v. City of Belle Glade*,
   178 F.3d 1175 (11th Cir. 1999)................................................. 68

\* *Chairs v. Burgess*,
   143 F.3d 1432 (11th Cir. 1998)........................................... 69, 70

*Chandler v. James*,
   180 F.3d 1254 (11th Cir. 1999)........................................... 45, 46

*Consumer Fin. Prot. Bureau v. Howard L., P.C.*,
   671 F. App'x 954 (9th Cir. 2016) .............................................. 72

*Davis v. Portfolio Recovery Assocs., LLC*,
   2021 WL 4133733 (M.D. Fla. Sept. 10, 2021)............................ 61

*\*Cases Chiefly Relied Upon.*

iv

*E.D. Systems Corp. v. Southwestern Bell Telephone Co.*,
674 F.2d 453 (5th Cir. 1982) ..................................................... 71

*EEOC v. Guardian Pools, Inc.*,
828 F.2d 1507 (11th Cir. 1987) ................................................. 46

*Fed. Trade Comm'n v. AMG Cap. Mgmt., LLC*,
910 F.3d 417 (9th Cir. 2018) ..................................................... 13

\* *Fed. Trade Comm'n v. Direct Benefits Grp., LLC*,
2012 WL 5430989 (M.D. Fla. Nov. 7, 2012) ............................. 61

*Fed. Trade Comm'n v. Elec. Payment Sols. of Am. Inc.*,
482 F. Supp. 3d 921 (D. Ariz. 2020) ......................................... 52

\* *Fed. Trade Comm'n v. Leshin*,
618 F.3d 1221 (11th Cir. 2010) .............................. 47, 48, 65, 70

\* *Fed. Trade Comm'n v. On Point Cap. Partners LLC*,
17 F.4th 1066 (11th Cir. 2021) ........................................... *passim*

*Fed. Trade Comm'n v. Pukke*,
53 F.4th 80 (4th Cir. 2022) ....................................................... 50

*Fed. Trade Comm'n v. Tashman*,
318 F.3d 1273 (11th Cir. 2003) .......................................... 55, 63

*Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.*,
830 F.3d 1242 (11th Cir. 2016) ................................................. 40

*Fed. Trade Comm'n v. Washington Data, Res.*,
2012 WL 2075827 (M.D. Fla. June 8, 2012) ............................. 66

*Hiram Walker & Sons, Inc. v. Kirk Line*,
877 F.2d 1508 (11th Cir. 1989) ................................................. 40

*Hughey v. JMS Dev. Corp.*,
78 F.3d 1523 (11th Cir. 1996) ............................................ 66, 68

\* *In re Vistaprint Corp Mktg. & Sales Pracs. Litig.*,
2009 WL 2884727 (S.D. Tex. Aug. 31, 2009) ........................... 61

v

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
    512 U.S. 821 (1994) .................................................................. 65

*Kurimski v. Shell Oil Co.*,
    2022 WL 2913742 (S.D. Fla. June 30, 2022) ............................ 60

*LabMD, Inc. v. Fed. Trade Comm'n*,
    894 F.3d 1221 (11th Cir. 2018) ................................................ 67

\* *Liu v. SEC*,
    140 S. Ct. 1936 (2020) ..................................................... *passim*

*McComb v. Jacksonville Paper Co.*,
    336 U.S. 187 (1949) ........................................................... 47, 48

\* *McGregor v. Chierico*,
    206 F.3d 1378 (11th Cir. 2000) .................................... 47, 48, 53

*Mercer v. Mitchell*,
    908 F.2d 763 (11th Cir. 1990) .................................................. 65

*New York v. Operation Rescue National*,
    80 F.3d 64 (2d Cir. 1996) ......................................................... 49

*Newman v. Graddick*,
    740 F.2d 1513 (11th Cir. 1984) ................................................ 69

*Payne v. Travenol Labs., Inc.*,
    565 F.2d 895 (5th Cir. 1978) .................................................... 68

*Reich v. United States*,
    239 F.2d 134 (1st Cir. 1956) .................................................... 71

\* *SEC v. Goble*,
    682 F.3d 934 (11th Cir. 2012) ...................................... 66, 67, 68

\* *SEC v. Smyth*,
    420 F.3d 1225 (11th Cir. 2005) ......................................... 67, 68

*Shillitani v. United States*,
    384 U.S. 364 (1966) ................................................................... 1

*Taggart v. Lorenzen,*
　1399 S. Ct. 1795 (2019)............................................................ 70

*United States Commodity Futures Trading Comm'n v. Tayeh,*
　848 F. App'x 827 (11th Cir. 2021) ....................................... 51, 52

*United States v. City of Miami,*
　195 F.3d 1292 (11th Cir. 1999).................................................. 54

*United States v. Shamsid-Deen,*
　61 F.4th 935 (11th Cir. 2023) .................................................. 40

*United States v. Torkington,*
　874 F.2d 1441 (11th Cir. 1989)................................................. 73

*United States v. United Mine Workers of Am.,*
　330 U.S. 258 (1947) .................................................................. 46

*Useden v. Acker,*
　947 F.2d 1563 (11th Cir. 1991)................................................. 40

**Statutes & Other Authorities:**

15 U.S.C. § 45................................................................ 43, 44, 49

15 U.S.C. § 45(a) ................................................................. *passim*

15 U.S.C. § 45(l) ........................................................................ 43

15 U.S.C. § 53(b) ................................................................ *passim*

15 U.S.C. § 57b ...................................................... 43, 44, 45, 49

15 U.S.C. § 57b(b) .................................................................... 43

15 U.S.C. § 78j(b) ...................................................................... 67

15 U.S.C. § 78u(d)(5) ............................................................... 50

15 U.S.C. § 6103 ....................................................................... 50

28 U.S.C. § 1291 ............................................................................... 1

28 U.S.C. § 1331 ............................................................................... 1

28 U.S.C. § 1337(a) .......................................................................... 1

28 U.S.C. § 1345 ............................................................................... 1

28 U.S.C. § 1983 ............................................................................. 45

Fed. R. Civ. P. 65(d) ...................................................................... 66

Fed. R. Civ. P. 65(d)(2) ............................................. 17, 42, 70, 71

## STATEMENT OF JURISDICTION

The FTC brought this case under §13(b) of the Federal Trade Commission Act, 15 U.S.C. §53(b). The district court had jurisdiction under 28 U.S.C. §§1331, 1337(a), and 1345. Further, the district court had jurisdiction over the FTC's contempt claims in *Acquinity*[1] pursuant to the 2014 consent injunction and the court's power to enforce its own orders. *Shillitani v. United States*, 384 U.S. 364, 370 (1966).

This is an appeal from the district court's order imposing contempt sanctions and permanent injunctive relief against Defendants-Appellants following a non-jury trial. This Court has jurisdiction pursuant to 28 U.S.C. §1291.

---

[1] On June 6, 2023, this Court supplemented the record to include all docket entries for *FTC v. Acquinity Interactive, LLC, et al.*, 0:14-cv-60166 ("*Acquinity*"). Materials from the *Acquinity* record will be cited as "AQ-DE.__." The record entries in this action, 1:19-cv-25046 ("*On Point*"), will be cited as "OP-DE.__."

1

## INTRODUCTION

This is an appeal of twin summary judgment orders holding Katz and Levison in civil contempt and awarding permanent injunctive relief to the FTC on a materially disputed record, without a hearing. After liability was summarily imposed by the district court, a consolidated trial on compensatory contempt sanctions followed, in which the district court awarded $102,768,235.47 to the FTC under a gross receipts theory, subject to a claims process. This was despite intervening law from the Supreme Court, *AMG Capital Mgmt., LLC v. FTC*, 141 S. Ct. 1341 (2021), holding that the FTC was not authorized under the FTC Act to obtain equitable monetary relief outside of the administrative process. As elaborated herein, the district court's rulings were deeply flawed.

Katz and Levison are owners and officers of various businesses, which operate hundreds of websites. The FTC brought this enforcement action in 2019 seeking both monetary and injunctive relief pursuant to 15 U.S.C. §53(b). Upon realizing that its quest for equitable monetary relief under the FTCA was nearing its end by virtue of jurisdictional briefing in *AMG* in 2020, the FTC began parallel contempt proceedings emanating out of a consent injunction

2

entered in an earlier FTC action from 2014 (*Acquinity*). Only one of the defendants in the contempt proceeding was a party to *Acquinity*. "Essentially, the FTC used its show cause motion under the 2014 *Acquinity* permanent injunction as the platform for moving the District Court to issue a new preliminary injunction in *Acquinity* against parties who were never defendants in the original *Acquinity* case." *Fed. Trade Comm'n v. On Point Cap. Partners LLC*, 17 F.4th 1066, 1076 n.4 (11th Cir. 2021).

After a rigorous claims process, the FTC obtained a final award of $19,599,235.68, half of which consisted of purely administrative costs such as the purchase of postage stamps. The district court further found Katz and Levison jointly and severally liable for the monetary award.

The FTC did not then—and does not now—have authority to obtain compensatory monetary relief outside of its enabling legislation. The district court, furthermore, engaged in rank fact-finding on summary judgment to award the FTC its unavailable remedy and injunctive relief. And it further erred in expressly declining to consider important, undisputed evidence that Katz and Levison made all reasonable efforts to comply with the *Acquinity*

3

injunction, in particular, by engaging highly-reputable law firms to delineate, and thereafter exceeding, the standards of then-existing federal law regarding FTCA compliance. Indeed, in an unusual development corroborative of Katz and Levison's good faith (and calling into serious question the traceability of their conduct to the ultimate sanction), the receiver, with express court approval, subsequently filed a malpractice action against those very law firms to recover the contempt sanction as damages.

The district court erred in failing to draw reasonable inferences in the light most favorable to the nonmovants. The court took a one-sided view of the summary judgment record by not only failing to consider Katz and Levison's extensive efforts to comply with the consent injunction, but also casting aside evidence of prominent website disclosures and pop-ups, dueling expert testimony, and low rates of consumer complaints, all of which served to significantly undercut the trial court's finding that deception occurred. The district court further erred in determining on a disputed record, that Levison (as an *Acquinity* nonparty) had notice of the injunction entered 5 years earlier in a completely unrelated lawsuit, which injunction was unenforceable in any event. In the absence of a

4

summary judgment hearing in either *Acquinity* or *On Point*, due process concerns are particularly acute.

The Court should reverse.

## STATEMENT OF THE ISSUES

I.    Whether the FTC was authorized to obtain compensatory monetary relief through contempt proceedings in the absence of statutory authorization.

II.    Whether the district court erred in measuring compensatory contempt sanctions by gross receipts and imposing the sanctions jointly and severally.

III.    Whether disputes of material fact and the ambiguous nature of the underlying injunction precluded summary relief.

**STATEMENT OF THE CASE**

**A.    The Parties and their Business**

Burton Katz and Brent Levison were owners and officers of various corporate entities, including On Point Global, LLC ("OPG"), which operated hundreds of websites fitting primarily into four lines of business: 1) a "freemium" service that provides free guides about public benefits in exchange for customer information, 2) a domain ownership business that buys and sells domain names, 3) a "pay for clicks" business that generates revenue through advertisement, and 4) an e-commerce business that sells guides and services for obtaining government benefits and services. (OP-DE.108:20-26; AQ-DE.178-76¶6). Only the freemium and e-commerce lines were challenged in the lower court action. (OP-DE.1).

The genesis of this business was Katz's personal experience with poor information supplied by local government agencies in connection with a vehicle registration:

> [W]hen I moved . . . from California back to Florida, at some point I had to transfer my vehicle registration. And two days at the DMV, effectively three or four different trips to two or three different DMVs, different information, I couldn't find anything really relevant online, and it was a giant waste of time. I was sitting talking to some of my

friends about it, just laughing about it, and . . . many of them had similar experiences . . . .

So I thought . . .  if I come up with an idea . . . sort of like the dummy guides that everyone has seen in Barnes & Noble, if you can curate and produce original content, show it in a very simplistic way to a consumer, you can actually help assist them in . . . accomplishing these sort of . . . perfunctory tasks around automotive compliance.
. . . .
As a natural extension of that . . . there's a lot of what I call social transfers where people can access different government services that are available to them, that they don't always know about or can get the right information about . . . . So we decided . . . we should start an ad supported model around a business like that.

(OP-DE.594:65-66).

Before the FTC filed its lawsuit, Katz's business idea employed over 284 people in the United States, Costa Rica, and Uruguay. (AQ-DE.178-76¶6).

Katz was OPG's Chief Executive Officer. (OP-DE.470-1¶1). Levison was OPG's Chief Administrative Officer and Vice President of Product. (OP-DE.470-13:31). Levison is also an attorney who operated as OPG's general counsel. (AQ-DE.200-26¶1; OP-DE.470-2¶12; OP-DE.470-13:11).

8

**B.    The *Acquinity* Action**

On July 29, 2013, the FTC filed a lawsuit against Acquinity Interactive, LLC and several other defendants in the Southern District of Florida. (AQ-DE.1). The FTC alleged, in a nutshell, that the defendants used unsolicited text messages to lure consumers to fraudulent "free merchandise websites," then required those consumers to provide personal information to qualify for free merchandise that did not exist or was unobtainable. (*Id.*¶¶19-38). The FTC alleged that consumers were then targeted for unsolicited pre-recorded phone messages. (*Id.*¶¶39-45). Katz was not named or accused of any of this misconduct in the initial pleading. Levison was not a party to this lawsuit at any time.

On June 16, 2014, the FTC added Katz as a defendant, alleging that he and another individual operated an SMS technology software platform, which Acquinity used to make monthly charges of $9.99. (AQ-DE.88¶44). This practice is known as "mobile billing." The FTC's claims against Katz were confined to the allegation that Katz failed to "clearly and conspicuously disclose" the mobile billing charge. (*Id.*¶47). A few months after the FTC amended its complaint, all parties settled. (AQ-DE.125).

The district court thereafter entered a stipulated permanent injunction. (AQ-DE.132). Section I prohibited the defendants from "placing charges on telephone bills." (*Id.*:3). Section II followed that prohibition with a broadly-worded injunction barring "misrepresentations":

> IT IS FURTHER ORDERED that, in connection with the advertising, marketing, promotion, offering for sale, sale, or distribution of any product or service, Stipulating Defendants, . . . are permanently restrained and enjoined from making, or assisting others in making, expressly or by implication, any false or misleading material representation, including representations concerning the cost, performance, efficacy, nature, characteristics, benefits, or safety of any product or service, or concerning any consumer's obligation to pay for charges for any product or service.

(*Id*).

It is undisputed that Levison was never provided with a copy of this consent injunction, nor was he aware of its specific terms until after *On Point* was filed in 2019. (AQ-DE.200-26).

The *Acquinity* case was closed and sat dormant for more than 5 years until it was resurrected by the FTC's motion for order to show cause. (AQ-DE.135). More on this later.

### C.    The *On Point* Action

Meanwhile, in December 2019, in a completely unrelated action, the FTC sued OPG, many of its subsidiaries, and six individuals, including Katz and Levison, pursuant to 15 U.S.C. §53(b). The FTC claimed that portions of OPG's business (specifically the freemium and e-commerce segments), were involved in deceptive practices because consumers might mistakenly believe: (1) that they can complete state motor vehicle or state licensing transactions on OPG's websites; (2) that consumers who submit payment and personal information will receive a state motor vehicle service or state license; (3) that consumers can obtain eligibility determinations for public benefits on OPG's websites; and (4) that consumers who submit personal information will receive eligibility determinations. (OP-DE.1:44-45).

In a sealed filing, the FTC requested, and the district court granted, an *ex parte* temporary restraining order and, thereafter, a preliminary injunction. (OP-DE.17; OP-DE.126). With immediate effect, the orders froze the assets of 59 defendants, including Katz and Levison. (OP-DE.17:7; OP-DE.126:5-6). The district court further

appointed a receiver, who continued operating OPG's businesses. (OP-DE.17:11-15; OP-DE.126:11-14).

After investigating and consulting with compliance professionals, the receiver recommended in her initial report to the district judge that the freemium line and e-commerce line continue operating in part, and determined that with some modifications, aspects that were in her view noncompliant, could be run profitably and nondeceptively. (OP-DE.108:20–24, 36-38).

The receiver remarked that she did not find anything "inherently illegal" about lead generation, which was part of freemium, nor the pay-for-services aspect of the e-commerce line. (*Id.*:36, 38). In a subsequent motion to modify website templates, the receiver emphasized that various segments of the business "could be beneficial to consumers." (OP-DE.169¶¶3-5). The receiver noted that Levison "cooperated substantially" with her efforts to understand the "relatively complicated business model" and sought permission to hire Levison as a paid consultant. (*Id.*¶¶17-18). The court allowed the receiver to hire Levison over FTC objections. (OP-DE.234:5).

The court-approved templates retained a similar look and feel to the original websites, however, they contained tuned-up

12

disclaimers and pop-ups. (OP-DE.169 and exhibits thereto; OP-DE.234). After OPG changed the disclaimers to emphasize the lack of government affiliation, OPG's business substantially increased. (OP-DE.595:57). Specifically, cash on hand increased from $2.3 million to $39.5 million. (*Compare* OP-DE.108:33 *with* OP-DE.662-2:1).

## D.   *AMG* and its Aftermath

During the pendency of *On Point*, some important cases came up for review before the Supreme Court. The first shoe to drop was *Liu v. SEC*, 140 S. Ct. 1936 (2020), in which the Supreme Court examined provisions of the securities laws permitting "equitable relief" (absent from the FTCA) and held, among other things, that foundational principles of equity limited such relief to net profits, not gross receipts.

While *Liu* was being decided, *Fed. Trade Comm'n v. AMG Cap. Mgmt., LLC*, 910 F.3d 417 (9th Cir. 2018) came to the Supreme Court on a petition for writ of certiorari. In response to the cert petition, the FTC stated that, although "[t]he relevant statutory schemes are not identical," *Liu* "could shed light on the propriety of a number of other federal agencies' enforcement regimes." Brief of Respondent, *AMG Capital Mgmt. v. FTC*, 2019 WL 6840723 (U.S.) (filed December 13,

2019). The FTC agreed that the Supreme Court should accept jurisdiction in *AMG*, which it did. *AMG Cap. Mgmt., LLC v. Fed. Trade Comm'n*, 141 S. Ct. 194 (2020).

Forecasting, perhaps, that the Supreme Court would terminate the FTC's ability to use a Section 13(b) injunction to obtain the equitable monetary relief it had sought in *On Point*, on February 12, 2020, it moved for an order to show cause against Katz and other entities in the long-dormant *Acquinity* matter, seeking compensatory contempt sanctions in the amount of gross receipts. (AQ-DE.135:19). As noted above, none of these entities had anything to do with *Acquinity* and even Katz was only implicated in a small slice of that lawsuit as the operator of a mobile billing software provider.

On April 22, 2021, the Supreme Court decided *AMG Capital Management, LLC v. FTC*, 141 S. Ct. 1341 (2021), unanimously holding that §13(b) of the FTCA—the lone predicate for *On Point*—did not allow the FTC to seek equitable monetary relief. *Id.* at 1352.

14

Accordingly, Katz and Levison immediately moved to vacate their asset freeze.[2] (OP-DE.369). The FTC responded by moving in *Acquinity* for a second order to show cause against Levison, who had absolutely nothing to do with *Acquinity*, as well as other nonparties to the *Acquinity* injunction. (AQ-DE.137). The FTC also filed a motion for a temporary restraining order, seeking to freeze, on a joint-and-several basis, up to $104,723,274.62. (AQ-DE.138:19-21).

The district court granted both orders to show cause and directed a show-cause hearing to be held "contemporaneously with trial, if any, in the [*On Point*] case." (AQ-DE.136:1; AQ-DE.174:13). In the omnibus order granting the Levison show-cause motion, the district court further granted the FTC's request for preliminary injunctive relief (AQ-DE.174; AQ-DE.175), and an asset freeze (*id.*), which overlaid the injunction and asset freeze then in effect in *On Point.* These actions were in stark contrast to prior statements made by the district judge, in which he acknowledged in relation to

---

[2]    As a fiduciary to potential claimants and corporate entities alike, the receiver adopted the general position of the individuals regarding the unavailability of monetary relief to the FTC. The FTC then tried to disqualify the receiver. (OP-DE.272).

contempt that "the scope of this Court's authority to order sanctions is likely limited by the bounds of Section 13(b)"). (OP-DE.298).

Given the imposition of the coextensive asset freeze in *Acquinity*, the district court denied Katz and Levison's motion to lift the *On Point* freeze as moot. (OP-DE.484).[3] Summary judgment motions followed.

### E.    Summary Judgment Evidence

On July 9, 2021, the FTC filed its motion for summary judgment in *On Point* seeking permanent injunctive relief. (OP-DE.454). Several weeks later, on August 27, 2021, the FTC filed a motion for summary contempt in *Acquinity* seeking a compensatory contempt award. (AQ-DE.181). With some exceptions unique to contempt, summary proceedings in both cases were based largely on the same corpus of evidence regarding deception. The district court did not hold hearings in either matter.

While the alleged *On Point* deception was the linchpin of both motions, summary contempt involved additional and distinct elements including, relevant here; violation of a clear and

---

[3]    On review of the preliminary injunction in *On Point*, this Court disagreed with the district court's mootness determination as to codefendant Dragon Global. *See On Point*, 17 F.4th at 1078.

unambiguous order; the ability of the defendants to comply with it; and actual knowledge of the underlying order under Rule 65(d)(2). (AQ-DE.181:2).

The FTC shoehorned the §5(a) deception prong from their summary injunction motion into the violation element of contempt, claiming, in effect, that OPG's misrepresentation of services on the freemium and e-commerce websites constituted a *de facto* violation of the injunction entered 5 years earlier in the unconnected *Acquinity* mobile-billing case. (*Compare id.*:5-8 *with* OP-DE.454:1-5).

To support deception as to the guide-sales (i.e., e-commerce), the FTC pointed to a combination of website design, sponsored links to search terms, and suggestive URL's. The FTC also highlighted complaints from a *de minimis* number of aggrieved consumers and contended that the defendants "covered up" negative reviews by writing positive reviews. The FTC glued it together with an expert opinion that OPG's disclaimers were ineffective and consumer confusion was likely.

In particular, the FTC said that "Defendants' guide-sales websites claimed to perform state transactions – e.g., renewing a driver's license, registering a car, or getting a fishing license – but

instead gave consumers only a PDF of general information about the service they sought." (OP-DE.454:1). When consumers interested in such licenses typed certain terms into their browser, the websites would appear as "sponsored links" on major search engines, above the unpaid search results. The FTC claimed that Defendants paid for their links to appear when consumers searched for actual state agencies. (OP-DE.455¶2). The sponsored links would then display OPG's "portal sites." (*Id.*¶¶4-5). These sites' URLs contained a state name, a variant of "driver" or "drivers license," and ended in ".org" (e.g., "floridadriverslicenses.org"). (*Id.*). One of OPG's portal sites was "DMV.com." (*Id.*¶¶8-9).

But the FTC's narrative did not accurately reflect the user flow. For instance, as the centerpiece of the deception, the FTC claimed that the portal sites' landing pages displayed the outline of the state border and a menu of links referencing state services, like "New license" or "Renew," thereby creating the inference that OPG's websites offered these services. (*Id.*¶¶5, 16-17). In doing so, however, the FTC created a lopsided impression of OPG's offerings because it recited only the content of the ***landing page***, without the search ad copy ***that specifically brought the consumer to that landing***

***page***. The following is an example of what a typical consumer would have seen prior to reaching one of the landing pages, which specified that OPG sites provided a "guide" and "details on getting . . . a license":



(AQ-DE.178-1: 340; AQ-DE.200-10:6, 62). By decoupling the search ad copy from the landing page, the FTC distorted the user experience and advanced the claim that the websites promised to do something they couldn't deliver.

The FTC further omitted mention that those very landing pages linked to official government sites, and repeatedly indicated that they provided "information" and "application assistance":



(OP-DE.178-1:134 (red mark-up added)).

The portal sites then led to one of the billing or so-called transaction sites, like "license-driver.com" or "registrationtags.com." (OP-DE.455¶¶11-12, 14-15). These sites (***only after a user clicked through search ad copy, clicked past a separate pop-up disclaimer*** (OP-DE.440-1:209), ***and declined to click the official DMV link***), used headlines like "Renew Drivers License In Your State." (OP-DE.455¶¶13, 16-17).

The FTC acknowledged that the websites included numerous disclaimers and pop-ups indicating that the sites were not affiliated with government, but contended that they were "buried" in blocks of text, vague, or otherwise insufficient to curb consumer confusion. (OP-DE.454:2).

As to the freemium line, according to the FTC, Defendants "operated dozens of websites that promised to verify consumers' eligibility for public benefits, such as Section 8 housing, food stamps, Medicaid, or unemployment. (OP-DE.455¶47). These websites used domains like "section-8-housing.org." (*Id.*¶¶47-48). The landing pages (subject to similar search ad copy) contained headlines like "Find Out If You Are Eligible for [Public Benefit]" or "Find out if you Qualify." (*Id.*¶53).

Consumers continued through a series of screens asking for personal data, including demographic, medical and financial information. (*Id.*¶¶54, 57). Each data-gathering screen contained a bold headline above the form: for example, "Confirm Your Date of Birth and Gender to Verify Eligibility," "Confirm Your Eligibility," or "Confirm your information to get your Eligibility Guide." (*Id.*¶¶58, 60). Defendants subsequently provided a free PDF guide containing information about the selected public benefit. (*Id.*¶62). The freemium sites contained disclaimers similar to those on the guide-sales sites disclaiming government affiliation (*id.*¶55), which the FTC contended were equally ineffective, and that most test subjects believed that

21

freemium sites would determine their eligibility for government services. (*Id.*¶¶56, 68-70).

The FTC further pointed out that some payment processors suspended or closed OPG's accounts due to exceeding chargeback thresholds and that OPG was involved in a practice known as "load balancing" to minimize the appearance of chargeback violations. (*Id.*¶¶29-33). The FTC further showed that Google and Bing, at times, suspended Defendants' advertising accounts. (*Id.*¶24).

The FTC hired Michelle L. Mazurek (a computer engineer with no experience in advertising or psychology) to conduct a consumer perception survey. (OP-DE.440-5). The district court allowed Mazurek's opinion but acknowledged that she had "limited formal training in survey design and no experience in designing and executing a survey regarding consumers' understanding and perception of advertising." (OP-DE.517:10). Mazurek opined that most test subjects believed OPG's guide-sales and freemium sites would renew their licenses or provide eligibility determinations, and that consumers were unlikely to see or understand the disclaimers. (OP-DE.455¶¶43-44, 69-70).

While Katz and Levison for the most part did not dispute the content of the indicated websites, they took issue with the FTC's blatant cherry-picking, and in particular, the inferences and conclusions drawn from the evidence, including the opinions of its expert (Mazurek) on the insufficiency of the disclaimers. Katz and Levison also presented countervailing evidence and an expert rebuttal.

The FTC conducted "undercover" transactions of both guide-sales and freemium content, including a mobile purchase. (OP-DE.440-1¶¶26, 51, 64). As the FTC acknowledged, regardless of the means of access, OPG's websites—both e-commerce and freemium—contained numerous disclaimers of government affiliation, which further confirmed the product or service offered, and emphasized that government applications "must be processed at an official . . . location." (OP-DE.440-1:121-122; 134-135; 193-194; 207-209; 264, 269, 276-277; 292-298).

Indeed, between 2017 until 2019, _**all**_ e-commerce vehicle-related landing pages, whether accessed through desktop or mobile platforms, featured a prominent pop-up (which users were required to actively acknowledge prior to proceeding), accounting for nearly half of all guide-sale purchases:



(OP-DE.440-1:276-277; OP-DE.594:163-168).

Then, **_prior to being allowed to transact any business_** on the guide-sale billing page, the consumer received an "IMPORTANT NOTICE" (all caps, in differentiated blue font), which stated:

> Please click "continue" to proceed and agree to the following . . . . You agree that the site is privately owned and is neither operated by, nor affiliated with, any government agency . . . . The site provides . . . information and downloads as a private value-add to services provided by [official government agency].

(OP-DE.440-1:209; AQ-DE.205¶225). An example follows:



(*Id*.).[4] These disclaimers are no different than those encountered as part of daily life, as the judge acknowledged at trial.[5]

The guide-sales billing sites included headers on each page stating: "[Website] is in no way or fashion affiliated with any federal or local government agency or offices." (OP-DE.440-1:207-208). A prominent heading featured, in all caps, "OBTAIN YOUR ROAD

---

[4]    Due to margin constraints and orientation, this image appears substantially smaller than it would in a browser. (*See id*.).

[5]    "I just had this morning, when I had an update on my iPhone, it says, click here to agree to the terms and services, and I didn't have to like scroll through all the terms. So I could have, but I chose not to. So does that mean Apple has a misleading disclaimer?" (OP-DE.595:188).

GUIDE," while the body of the page confirmed: "The services we provide are available for free in the official sites or local offices." (*Id.*). A footer repeated: "[Website] is a privately owned website and is not affiliated with any government agencies. The services we provide are available for free in the official sites or local offices." (*Id.*). Then, twice more, the consumer was invited to "purchase . . . and download" a "guide and resources." (*Id.*).

Navigating to the "contact us" link on the guide-sales sites further showed, in differentiated red font, the following notice: "Important. We are an independent company providing value-added services to assist consumers with various motor vehicle related services. If you have questions for your local DMV office, please contact them directly." (OP-DE.440-1:122).

Similarly, in the freemium line, a header indicated: "This site is privately owned and is neither affiliated with, nor endorsed by any government agency." (OP-DE.440-1:193-204). The website body contained a prominent blue banner, which stated: "Let us help you find everything you need to know with our guide." (*Id.*:193-197, 199). Transaction attempts on the freemium sites contained the foregoing header, plus an additional footer stating: "This site is privately owned

26

and is neither affiliated with, nor endorsed by, nor operated by, any government agency. We provide time saving information." (*Id.*:292-298). The website body, in large font, stated: "Confirm your information to get your Eligibility Guide." (*Id.*).

Contrary to the picture painted by the FTC, these repetitive and easily-noticeable disclaimers at every stage in the user flow were effective insofar as "evidence of chargebacks on OPG's websites were not high relative to the market and that there was a low volume of consumer complaints relative to the number of transactions," as the receiver testified point-blank. (AQ-DE.200-24¶20). Specifically, "[d]uring the 2017 through 2019 period, OPG sold nearly 5.5 million guides to consumers; of the 953 complaints received by the FTC as of June 25, 2019, two-thirds of the complainants did not purchase OPG products, and, of the remaining complainants, all but five received full refunds." (*Id.*). Regarding the freemium sites, the FTC received only 66 complaints from September 2014 until October 2019 out of 15 million customers. (OP-DE.440-1¶217; OP-DE.579:8). Furthermore, no credit card association (such as Visa or MasterCard), at any time, closed an OPG merchant account for exceeding a chargeback threshold. (AQ-DE.200-3¶21).

27

The payment processor chargebacks identified by the FTC were not as sinister as it claimed. Chargebacks were within accepted parameters (typically less than 1.5%, OP-DE.440-7:11-12) and occasional spikes were caused by merely closing down a website (which skews trailing chargeback ratios as they are no longer offset by new transactions). (AQ-DE.200-3¶20). And what the FTC viewed as improper "load balancing" ignored the fact that load balancing occurs for fundamental business reasons such as consumer demand exceeding the capacity of the processor ("cap issues"). (*Id.*¶¶22-24; OP-DE.440-39:1). When chargebacks occurred, OPG instituted chargeback reduction plans which included investigation and mitigation efforts. (AQ-DE.200-3¶21; OP-DE.440-39:1).

Notably, visitors that subscribed to receive a free guide on freemium pages often continued to engage with OPG's content, demonstrating repeat business. Approximately 40-50% of visitors reengaged with OPG's content on consecutive days and approximately 60% of the people who visited OPG public benefit guide sites returned. (AQ-DE.127-2¶8). Technical support was provided for customers. (*Id.*¶5). And OPG staffed a call center to address consumer concerns. (OP-DE.470-13:79; 440-1:132).

28

OPG also offered a money-back guarantee to all consumers. (OP-DE.440-1:121-131 ("Money Back Guarantee" link included on every page)); OP-DE.437-3:213-14, 234-35). As the receiver testified, the consumers who failed to receive a refund from OPG can be counted on one hand. (AQ-DE.200-24¶20). And before the regulatory inquiries relevant to this lawsuit led to Microsoft closing OPG's Bing advertising accounts, OPG was a top 1% customer. (AQ-DE.178-44:89-90). Shortly before the shutdown, Microsoft sent a team 8,000 miles to Uruguay to deepen its relationship with OPG. (*Id.*).

As to the Mazurek report, Katz and Levison proffered the rebuttal testimony of their expert, Justin R. Anderson, who concluded that Mazurek's surveys were "fatally flawed" in numerous ways (OP-DE.470-9:4-7, 9, 20-21), but most alarmingly, that the surveys presented OPG's websites in a significantly smaller font, in fact "less than half of the size," which respondents reported substantial difficulty in reading (*id.*:20-21). Anderson further opined that Mazurek's survey was impermissibly suggestive as it indicated to subjects that website visits had a specific purpose of obtaining a license or benefit-eligibility determination. (*Id.*:26-27).

Participants in the Mazurek survey were asked to role-play a fictitious person named Terry Spencer who "had a goal (renew license; check eligibility) and found herself at the website in question." (OP-DE.440-5¶65; OP-DE.470-9:9). This instruction was not only in contradiction to the disclaimers, but introduced survey participants to OPG websites without ad copy confirming that no such good or service was offered. Further, the survey lacked appropriate controls (OP-DE.470-9:22-24) and did not mimic market conditions whatsoever. (*Id.*:16-19).

Importantly, beyond conflicts in evidence regarding the efficacy of the disclaimers, chargeback ratios, consumer satisfaction, and the validity of the consumer perception surveys, OPG retained and relied upon outside counsel, including the well-regarded law firms of Baker Hostetler and Crowell & Mooring, to undertake a "comprehensive," "large scale compliance review" of all relevant websites to "ensure total compliance" with applicable law. (AQ-DE.200-24¶¶5-19).

In particular, the law firms reviewed "disclaimers, data collection and data sharing rules, privacy policies, site content, and landing pages used in monetization, as well as the content of the guides provided by the websites." (*Id.*¶8). "To complete this

compliance review," the law firms assembled a team of professionals familiar with advertising and regulatory issues, "and the legal team performed the requested compliance review and provided legal advice regarding the foregoing matters." (*Id.*¶9). The receiver confirmed, based on her review of corporate records, and in consultation with her own team of compliance professionals, that "OPG followed the advice it received from counsel." (*Id.*).

There was no evidence that compliance counsel "raised any existing or potential compliance issues with FTC regulations or the *Acquinity* Order and which provided advice was not followed by OPG." (*Id.*¶19). Indeed, Baker Hostetler determined that OPG's business practices presented a "low legal risk" of private actions or government enforcement litigation. (*Id.*¶7).

The receiver confirmed:

> Based on my review of the OPG's records, OPG requested legal advice from each of the three firms regarding whether OPG's websites were in compliance with applicable regulations and if not, how to bring them into compliance; the three firms provided such advice; and OPG followed the advice.

(*Id.*¶17).

31

Levison corroborated the receiver's observations, testifying that, as general counsel, he aimed to instill a "compliance culture" through compliance review and training by outside counsel. (OP-DE.470-13:45-46, 51-52, 106-107, 204).

Finally, the issue of actual notice was also contested at summary judgment. Recall that Levison was a nonparty to *Acquinity*. Levison testified that he never received a copy of the *Acquinity* injunction order or reviewed its contents until after the FTC filed its enforcement action in 2019. (AQ-DE.200-26¶¶2-4). Rather, sometime in 2014, Katz held up an order in Levison's presence and told Levison that Katz settled his dispute about mobile billing with the FTC and that Katz was required to pay money. (*Id.*, and AQ-DE.178-46:103). Levison did not seek out the order because it concerned mobile billing and was unconnected to Levison. (AQ-DE.200-26¶¶2-4).

This is consistent with Katz's recollection that he verbally communicated with Levison "regarding the substance of the Order and/or the settlement of the case," which substance Levison

understood to mean that Katz settled his mobile billing dispute.[6] (AQ-DE.178-34:2; AQ-DE.200-26¶3). Katz did not communicate any specific terms to Levison or provide him with a copy of the order at any time. (AQ-DE.200-26¶3).

## F.    Summary Judgment Rulings

On September 29, 2021, the district court granted both motions for summary judgment against Katz and Levison. (OP-DE.528; AQ-DE.225).

### 1.    Summary Injunction

The district court identified the "primary dispute" on the §5(a) claim as whether OPG's websites were "likely to mislead consumers in context." (OP-DE.528:13). As to the paid guides business (e-commerce), the court found that "On Point's practices actually misled consumers," and pointed to the following evidence in support. First,

---

[6]    Significantly, the trial court determined that this statement, which was equally directed to co-defendant Elisha Rothman, was sufficiently ambiguous to preclude summary contempt as to Rothman because "a conversation with Katz about the *Acquinity* litigation in general," and his awareness of the settlement, "does not confer 'actual notice' of a settlement order." (AQ-DE.225:7). With respect to notice, Levison and Rothman were similarly situated other than Katz holding up (but not providing, or specifying the contents of) a copy of the order to Levison. At trial, the district court directed a verdict for Rothman, finding insufficient notice. (OP-DE.579:2).

33

that consumers sought refunds "in such high numbers that On Point's merchant accounts breached payment processors' chargeback thresholds at least 64 times." (*Id.*:14). Second, that OPG "worked to mask these issues by creating a call center script to address unhappy customers" and by writing favorable reviews of its business online. (*Id.*) Third, that the FTC submitted "hundreds of consumer complaints, in which consumers described their frustration." (*Id.*). Fourth, and finally, that the shutting down of advertising accounts were a "red flag" and "highly probative" that OPG's practices were "likely to mislead a reasonably prudent consumer." (*Id.*).

The court found that the disclaimers were "confusing at best" due to the site design and font type, and further, that the disclaimers did not state "that the websites would *not* complete licensing or registration." (*Id.*:15-16).

As to the freemium websites, the district court similarly concluded that the FTC proved a §5(a) violation because "there was no language informing consumers that the sites would not provide eligibility determinations." (*Id.*:17). The court determined that the disclaimers were small and insufficient, and concluded that the "net

impression" from the freemium line was likely to mislead consumers. (*Id.*:17-18). The court imposed a permanent injunction which, among other things, prohibited Katz and Levison from using consumer information unless they obtained "express verifiable authorization." (OP-DE.528:31-36; OP-DE.582).

### 2.    Summary Contempt

As to summary contempt, the district court concluded that the *Acquinity* consent injunction was "valid and lawful and not so vague and ambiguous as to be an impermissible obey-the-law injunction." (AQ-DE.225:3). The court found that a violation of the *Acquinity* injunction occurred by virtue of the *On Point* deception. (*Id.*:3-4). And the court determined that nonparty Levison had "actual notice" of the *Acquinity* injunction sufficient to ensnare him in the violation because Levison knew of its "mere existence," (*id.*:5), even though Levison was never provided a copy of the injunction and its terms were never conveyed to him. (AQ-DE.200-26). The court deemed irrelevant whether Levison knew of its particulars. (AQ-DE.225:5).

Finally, the district court disregarded evidence of Katz and Levison's reasonable efforts to comply with the injunction by retaining compliance counsel and following their advice, concluding

35

that "advice of counsel is not a defense to contempt." (*Id.*:7). As previously set forth, it was undisputed that OPG engaged three law firms to undertake a "comprehensive," "ongoing," and "large-scale" compliance review of all relevant websites to "ensure total compliance" with applicable law. (AQ-DE.200-24¶¶5-19).

In rejecting the evidence of Katz and Levison's good faith efforts, the court further reasoned (by assuming its own conclusion) that the disclaimers were insufficient in any event, because "the *Acquinity* Order required an end to false or misleading representations—there was no provision permitting such representations if a disclaimer was used." (AQ-DE.225:10). The district court deferred ruling on the remedy until trial. (AQ-DE.225:11, and n. 5).

## G.    Trial on Damages

Following summary judgment, the only issue left for adjudication as to Katz and Levison was the amount of compensatory sanctions. The 6-day bench trial involved matters largely not pertinent here, such as the liability of the other defendants for the corporate acts of OPG. The district court ruled that gross receipts in the amount of $102,768,235.47 were the appropriate baseline sanction. (OP-DE.579:2, 44-45).

36

This sum included $17,297,754.87 in compensation to freemium consumers who didn't pay a dime to OPG. (*Id.*:2; OP-DE.592:81). The court instituted a claims process to pay out the award, reasoning "that there was significant and credible anecdotal evidence to indicate that many of the customers either suffered no harm or were wholly satisfied with their experiences with the Defendants." (OP-DE.579:2). The court imposed the sanction jointly and severally against Katz and Levison. (*Id.*:44-45).

## H.    Claims Process and Current Status of Receivership

The claims process was extensive and distributions are ongoing. After trial, the receiver filed a motion to approve various claims-administration proposals. (OP-DE.596). The receiver set forth noticing standards, a timeline, and a refund plan consistent with the gross receipts ruling of the district court. (*Id.*). As to the freemium business, which consumers paid nothing for, the receiver proposed liquidated damages ranging from $5 to $15. (*Id.*:7). The FTC had been closely involved in the claims distribution plan and the receiver implemented all of its reasonable suggestions. (OP-DE.604:2).

Notwithstanding, the FTC ultimately opposed the receiver's proposal. It took particular issue with the means of noticing and

distribution. In this connection, the FTC pressed the receiver to issue, in her words, "[a] mass mailing of *de minimis* pro rata checks to all Freemium consumers" which would have cost more than $6.5 million in postage alone. (*Id.*:7). (The receiver further noted that almost 20% of freemium customers did not even have a physical address on file). (*Id.*). As to the guide-sales, the FTC similarly demanded the receiver send indiscriminate checks to consumers using an opt-out procedure, costing an additional $4 million in postage, "to addresses that may be more than three years old and made payable to names that are legally inaccurate." (*Id.*:8).

Essentially, the FTC wanted to liquidate the entire receivership estate and business irrespective of any restitutionary considerations. The court adopted the receiver's plan. (OP-DE.607). Thereafter, the court extended claims deadlines twice (OP-DE.613; 615) and supplemented the claims process with a postcard campaign. (OP-DE.630).

The claims bar date expired October 18, 2022. (OP-DE.639:3). After mailing more than 11 million postcards, sending 4 rounds of email notices, and a round of SMS messaging (*id.*:5-6), the receiver estimated "allowed claims" to be $8,471,711.74, which amount

included over $3 million worth of "unverified" claims. (*Id.*:7). Administration expenses totaled $8,866,985.29. (*Id.*:2).

On March 13, 2023, the receiver indicated she concluded the claim process and quantified compensatory contempt sanctions as $19,599,235.68.    (OP-DE.665:1). Distributions of the contempt sanctions continues, and the receiver presently retains $477,752.21 in administrative expenses for addressing unclaimed payments. (*Id.*).

Somewhat ironically, the court further authorized the receiver to prosecute a legal malpractice action against OPG's former compliance counsel to recoup those very sanctions that the district court traced squarely to Defendants' contemptuous conduct.[7] (OP-DE.656:3). This action remains pending. (S.D. Fla. 22-cv-22606-JLK).

The district court finally imposed the sanction on March 14, 2023. (OP-DE.666). This appeal follows.

---

[7]    Indeed, the district court concluded that "reliance on the advice of counsel is irrelevant to the appropriate calculation of sanctions." (AQ-DE.232:2, and n. 2).

## I.    Standard of Review

This Court reviews questions of law *de novo*. *United States v. Shamsid-Deen*, 61 F.4th 935, 945 (11th Cir. 2023)

Orders granting summary judgment are similarly reviewed *de novo*. *Useden v. Acker*, 947 F.2d 1563, 1572 (11th Cir. 1991). The Court applies the same standards that controlled the decision in the district court; whether a genuine dispute exists as to any material fact, taking the evidence and all reasonable inferences thereto in the light most favorable to the nonmovant. *Id.*

Significantly, on review of summary judgment, the *de novo* standard does not change even in cases slated for a bench trial. *See Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1252 (11th Cir. 2016); *see also Hiram Walker & Sons, Inc. v. Kirk Line*, 877 F.2d 1508 (11th Cir. 1989) (declining to afford a presumption of correctness to district court's summary judgment findings, which disregarded contradictory evidence and drew inferences against nonmovant).

## SUMMARY OF THE ARGUMENT

The FTC opened parallel compensatory contempt proceedings in the long-dormant and unrelated *Acquinity* action to obtain indirectly what it was prohibited from obtaining directly, creating a "heads I win, tails you lose" scenario. In allowing this procedure, the district court acted contrary to *AMG* and established contempt caselaw. The district court further erred in awarding those sanctions against Katz and Levison jointly and severally, and failing to offset business expenses, contrary to *Liu*. And freemium receipts could not have been included in the award under any circumstance as consumers paid nothing for it. Because the sanction was unauthorized, several times over, it had no compensatory characteristics whatsoever.

Summary judgment was further precluded by material issues of fact regarding deception. The district court accordingly erred in granting summary injunctive relief and summary contempt. As to contempt in particular, this relief was further barred by the ambiguous nature of the *Acquinity* injunction, and material issues regarding (a) Katz and Levison's inability to comply with it; and (b)

41

lack of Rule 65(d)(2) notice to Levison. The contempt sanction and permanent injunction must be reversed.

Should this Court remand, judicial reassignment is appropriate.

**ARGUMENT**

## I. The FTC Has No Statutory Authority to Obtain Compensatory Contempt Damages

To be clear, nobody disputes that a district court has the inherent authority to enforce its orders through the full range of punitive, coercive and compensatory sanctions. Nor can there be any doubt about the FTC's authority to obtain monetary relief through its traditional administrative powers defined in §5 and §19 of the FTCA. *See* 15 U.S.C. §45(*l*) (authorizing civil penalties against respondents who violate final cease and desist orders); §57b(b) (authorizing "relief as the court finds necessary to redress injury to consumers," including "refund of money or return of property"). And private litigants, without question, possess all proper means of redressing consumer harm through relevant statutory and common law claims.

The issue here does not touch any of these established interests. The question presented here is whether the FTC, as a creature of statute, may circumvent its clearly-defined administrative scope (including relevant procedural guardrails) to pursue freestanding legal relief through contempt. Bedrock principles of

43

contempt, and recent guidance from the Supreme Court in *AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341 (2021), proscribe this result.

In *AMG*, the Supreme Court held that §13(b)'s words, "permanent injunction" did not grant the FTC the authority to obtain monetary relief directly from courts and effectively bypass the process set forth in §5 and §19. *Id.* at 1347. Essential to its ruling was not only the plain language of the Act, but importantly, the notion that the administrative procedures of the FTCA functioned as a Congressional ***limitation*** on the FTC's ability to obtain equitable monetary relief, not merely a supplement to implicit equitable remedies. The Supreme Court emphasized:

> It is highly unlikely that Congress would have enacted provisions expressly authorizing *conditioned* and *limited* monetary relief if the Act, via § 13(b), had already implicitly allowed the Commission to obtain that same monetary relief and more without satisfying those conditions and limitations. Nor is it likely that Congress, without mentioning the matter, would have granted the Commission authority so readily to circumvent its traditional § 5 administrative proceedings.

*Id.* at 1349; *see also id.* at 1348 (stating further, "in light of the historical importance of administrative proceedings, that [contrary] reading would allow a small statutory tail to wag a very large dog").

And just as "Congress . . . does not . . . hide elephants in mouseholes," *id.* at 1349 (citation omitted), neither does it hide elephants in plain sight and enact totally useless legislation, which would allow the FTC to pursue parallel compensatory damages of astronomical sums, completely untethered to the FTCA and without notice.[8] The Act, as *AMG* instructs, does not expressly or implicitly authorize this relief. 141 S. Ct. at 1350 (reinforcing the precept that "the text and structure of the statutory scheme at issue can, 'in so many words, or by a necessary and inescapable inference, restric[t] the court's jurisdiction in equity,'" and concluding that "the inference against §13(b)'s authorization of monetary relief is strong," given the FTCA's elaborate enforcement provisions (citations omitted)).

Longstanding principles of contempt fortify this conclusion. Properly understood, compensatory contempt is not some fungible

---

[8]    Indeed, this would raise equally worrisome separation-of-powers concerns. *Cf. Chandler v. James*, 180 F.3d 1254, 1276–77 (11th Cir. 1999) (Tjoflat, J., specially concurring) (stating that enforcement of an injunction through compensatory contempt, contrary to the manner which Congress statutorily authorized in §1983 "would be violating the doctrine of separation of powers" "unless the show cause hearing were in effect transformed into a new section 1983 suit—with a jury trial, the opportunity to raise defenses, and so forth").

tool to be wielded by the FTC as a freestanding alternative to a legal right, but rather, it is wholly derivative of that right. "Compensatory sanctions merely imitate the relief that would be provided in a damages action." *Chandler*, 180 F.3d at 1270 (Tjoflat, J., specially concurring). Indeed, a complainant's right to receive civil monetary remedies through contempt "is dependent upon the outcome of the basic controversy." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 304 (1947); *see also EEOC v. Guardian Pools, Inc.*, 828 F.2d 1507, 1515 (11th Cir. 1987) (compensatory civil contempt fine "determined by the extent of the actual loss and the outcome of the basic controversy").[9] Without a legal predicate, compensatory contempt has no application.

---

[9]    *Guardian Pools* involved a contempt sanction arising out of an employment discrimination case, in which this Court held that "[civil contempt] sanctions may benefit persons who are not proven victims of discrimination." 828 F.2d at 1516. In so concluding, the Court reasoned that the contempt remedy was not constrained by the need to prove a violation of Title VII. *Id.*

We do not dispute that a compensatory contempt remedy can be doled out on a class-wide basis pursuant to a variety of equitable considerations. But that does not alter the fact that, regardless of how that equitable relief is ultimately fashioned, a statutory hook or other legal basis is needed to give rise to both a remedy and cognizable loss (e.g., as in *Guardian Pools*—42 U.S.C. § 2000e–5(g), allowing a court to award "any . . . equitable relief as the court deems appropriate").

Of particular note, this Court explored the interplay between §13(b) and civil contempt in the pre-*AMG* case, *McGregor v. Chierico*, 206 F.3d 1378 (11th Cir. 2000). This Court explained, consistent with the above tenets, that "the remedy for . . . contemptuous conduct is closely akin to the remedy for the statutory violation which lies at the heart of the action." *Id.* at 1387-88. Here, there is no longer a compensatory remedy for the statutory violation which "lies at the heart" of the §13(b) action. And even the district court (before summary judgment) appeared to concede this fact, remarking that "the scope of this Court's authority to order [compensatory contempt] sanctions is likely limited by the bounds of Section 13(b)." (OP-DE.298).

Notwithstanding, the district court ultimately "agree[d] with the FTC that the FTC's tactical decision to change strategy in the wake of the *AMG* decision is not an impermissible 'end-run' around a Supreme Court decision, but rather, is an attempt by the FTC to utilize another tool at its disposal . . . ." (AQ-DE.174:10; AQ-DE.225 n.5).

As for this additional tactical tool, the district court cited *FTC v. Leshin*, 618 F.3d 1221 (11th Cir. 2010) and *McComb v. Jacksonville*

47

*Paper Co.*, 336 U.S. 187 (1949). In *Leshin*, this Court held that it was not an abuse of discretion to award disgorgement of gross receipts to the FTC as a remedy for the defendants' compensatory contempt. In *McComb*, the Supreme Court approved coercive contempt sanctions against an employer for violating an order to make payments to their employees in the amount of damages caused by the violation, notwithstanding "the question whether the Administrator [of the Wage and Hour Division of the Department of Labor], when suing to restrain violations of the Act, [was] entitled to a decree of restitution for unpaid wages." *Id.* at 193-194.

But *Leshin* merely reflects the undisputed principle that compensatory contempt sanctions can include the full range of remedial relief warranted by the underlying legal right, 618 F.3d at 1237 (citing *McGregor*), and does not support the district court's conclusion that disgorgement can be utilized as "another tool" in the absence of such right. Nor does *McComb* shed any light on the propriety of such an award; that case was based on coercive contempt, which was calculated to obtain compliance, not

48

compensation. Thus, the FTC's additional tactical tool was ultimately illusory.[10]

What's left of the district court's reasoning is precisely what the Supreme Court rejected in *AMG*—that the FTC is entitled to an equitable shortcut merely because, had it hypothetically followed the (presently time-barred) administrative process set forth in §5 and §19, it might have gotten the same result:

> It is not as if consumer redress is unavailable at all to the FTC, as consumer redress is still available under Section 19, which the Court could turn to as an alternative statutory basis for guidance.

(AQ-DE.174:10). This reasoning is unsound and undercuts *AMG*. The administrative procedures of the FTCA are not just an aspirational alternative to unchecked equitable relief; they delimit the FTC's

---

[10]    And even if the FTC didn't require a statutory foothold to pursue monetary remedies on behalf for consumers, the FTC would face equally problematic standing issues, because standing "does not extend to the vindication of the private interests of third parties." *New York v. Operation Rescue National*, 80 F.3d 64 (2d Cir. 1996). Further, on this summary judgment record, the FTC has not attempted to— let alone succeeded in—proving a private cause of action to anchor third-party compensatory relief in any event.

enforcement authority. The trial court erred in concluding otherwise.[11]

## II. The District Court Erred in Awarding Gross Receipts, and Freemium Damages, Jointly and Severally

Compounding the error, the district court ignored the clear tenets of *Liu v. SEC,* 140 S. Ct. 1936 (2020) and failed to offset OPG's business expenses from the contempt sanction.[12] *Liu* addressed the outer bounds of equitable disgorgement, holding that a disgorgement award must not exceed a wrongdoer's net profits to be considered equitable under the securities laws.

Although §78u(d)(5) of the Securities Exchange Act framed the backdrop of the ruling, the Supreme Court's holding reflected the "foundational principle" in equity that "it would be inequitable that [a wrongdoer] should make a profit out of his own wrong." *Id.* at 1943

---

[11]    We note that the Fourth Circuit recently concluded that *AMG* "[did] not in fact change the bottom line" as to whether a parallel contempt sanction could be upheld, which mirrored damages obtained by the FTC under a subsequently invalidated §13(b) theory. *Fed. Trade Comm'n v. Pukke*, 53 F.4th 80, 106 (4th Cir. 2022). However, there the contempt order was based upon a violation of the Telemarketing Sales Rule, which specifically allows damages. 15 U.S.C. §6103. Accordingly, this case is inapposite.

[12]    For example, expenses associated with third-party vendors, or billing and media partners.

(citations omitted). The Supreme Court emphasized that the disgorgement label is unimportant: "equity courts have routinely deprived wrongdoers of their net profits . . . even though that remedy may have gone by different names," including unjust enrichment, restitution, or accounting. *Id.* Citing Supreme Court decisions in a variety of contexts, the Supreme Court confirmed "that a remedy tethered to a wrongdoer's net unlawful profits, whatever the name, has been a mainstay of equity courts." *Id.*

The *Liu* holding was binding on the lower court. But the district court confined *Liu* to the securities context, claiming that it would be required to extrapolate the decision to contempt. (AQ-DE.174:11). This was not correct.

Indeed, this Court cited *Liu* in a recent case travelling under the Commodity Exchange Act and indicated that the sufficiency of business-expense evidence was "significant" to whether the trial court abused its discretion in failing to offset such expenses in a disgorgement award to the CFTC, while recognizing that Circuit precedent previously disallowed such offsets. *United States Commodity Futures Trading Comm'n v. Tayeh*, 848 F. App'x 827, 829 (11th Cir. 2021). At minimum, *Tayeh* supports the idea that *Liu* has

relevance to equitable restitution beyond the SEC context. *See also Fed. Trade Comm'n v. Elec. Payment Sols. of Am. Inc.*, 482 F. Supp. 3d 921, 928 (D. Ariz. 2020) ("*Liu* reached its conclusion by relying on equity jurisprudence generally, as opposed to relying on SEC jurisprudence specifically. Thus, *Liu's* holding . . . is not 'cabined' to SEC proceedings"). Because the intervening *Liu* decision was "clearly on point," it was relevant to establishing the quantum of equitable restitution available to the FTC, despite earlier cases. *See Atl. Sounding Co. v. Townsend*, 496 F.3d 1282, 1284 (11th Cir. 2007); *Tayeh*.

But the sanction fails for a further and distinct reason: a business-expense offset isn't just required by traditional equity—it also prevents the transformation of "an equitable remedy into a punitive sanction . . . ." *Liu*, 140 S. Ct. at 1946. Thus, the restitution must be traced to the alleged wrongdoers conduct—holding defendants "liable to account for such profits only as have accrued to themselves . . . and not for those which have accrued to another, and in which they have no participation." *Id.* at 1949 (citation omitted) (rejecting joint-and-several liability). Applying these precepts here, the district court further erred in awarding the FTC more than

52

the gains received by each individual defendant through their alleged violations, specifically, $2,498,028, as to Katz, and $1,521,780 as to Levison. (AQ-DE.159-1¶6; AQ-DE.159-4¶5). This was in contravention of *Liu's* bar on joint-and-several liability.

And with greater reason, it goes without saying, the district court's $17,000,000-plus in compensatory sanctions relating exclusively to the freemium line, for which consumers paid nothing, exceeded the bounds of permissible equitable relief because it was wholly unconnected to consumer loss. *See McGregor*, 206 F.3d at 1388 ("[T]here can be no 'equity' in a compensatory award except as it provides a fair equivalent for some loss." (citation omitted)).

Moreover, this sanction would have been further unavailable, under any theory, because the *Acquinity* injunction barred misrepresentations regarding a consumer's "obligation to pay," which was clearly not triggered by freemium. (AQ-DE.132:3).

In sum, the FTC was not authorized to obtain equitable monetary relief in the first place, and the district court exceeded the bounds of equity by imposing sanctions exceeding net profits, which accrued almost entirely to other defendants (and third parties) under a theory of joint-and-several liability. In addition, regarding the

53

freemium line, the sanction had no nexus whatsoever to consumer loss. Because the contempt sanction had no compensatory characteristics, it is properly characterized as punitive and must be reversed. *See United States v. City of Miami*, 195 F.3d 1292, 1298 (11th Cir. 1999) ("[A] district court may not use the civil contempt power to impose what amounts to a punitive or criminal contempt sanction," which "may only be fashioned after many of the due process safeguards afforded to defendants in criminal proceedings . . . are provided").

## III.  The District Court Erred in Granting Summary Judgment

The summary judgment rulings were flawed for other important reasons. OPG is a legitimate business. The receiver continued to profitably run that business—over repeated FTC objections and with court approval—for 3 years. Indeed, the district court ultimately realized only after trial on damages (unfortunately too late), "that there was significant and credible anecdotal evidence to indicate that many of the customers either suffered no harm or were wholly satisfied with their experiences with the Defendants." (OP-DE.579:2). This alone mandates reversal.

But even more remarkable, OPG's business was, in fact, more profitable in the period after which the receiver took over the business and amplified website disclaimers (*compare* OP-DE.108:33 *with* OP-DE.662-2:1)—leading to the inescapable inference that consumer purchase decisions on OPG's websites—as the trial judge implicitly acknowledged—were simply not animated by supposed government affiliation. In the end, the FTC's theory—to be perfectly blunt—was bunk. This matter should have gone to the fact-finder on liability.

### A. Deception Was Materially Disputed

To prevail under §5(a), the FTC was required to show materially undisputed proof of "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. §45(a). That, in turn, required a showing that (1) there was a representation; (2) the representation was likely to mislead consumers acting reasonably under the circumstances; and (3) the representation was material. *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003). The alleged OPG deception was the foundation for not only injunctive relief but also the violation of the *Acquinity* injunction undergirding contempt, therefore, this prong is addressed first.

The FTC presented four general categories of evidence to support the inference of deception: (1) the language and layout of the sites; (2) consumer complaints and chargebacks; (3) expert testimony; and (4) so-called "reputation management." For each category of evidence presented, however, Katz and Levison presented countervailing evidence and inferences. As previously set forth, the FTC's inferences were largely based on taking website snippets and removing them from the user flow.

In particular, prior to reaching OPG landing pages, the user would have been aware from search site ad copy that the linked website did not purport to provide licenses or eligibility determinations—but a "comprehensive guide," "general bits of information you should know . . . before you get your . . . license," and the ability to "review the requirements and process for obtaining a . . . license." (AQ-DE.200-10:6, 62). The FTC created a misleading impression of OPG's websites by highlighting the landing pages while excluding the ad copy that brought the consumer there.

Importantly, beyond the ad copy, a combination of the following disclosures and pop-ups was seen by all visitors to guide-sales

landing pages, which identified the product or service offered, and disclaimed government affiliation:

- ATTENTION . . . . Car registrations must be processed by an official DMV . . . By clicking "continue" you acknowledge that this site is privately owned and not affiliated with any government agency.

- THIS PRODUCT OR SERVICE HAS NOT BEEN APPROVED OR ENDORSED BY ANY GOVERNMENTAL AGENCY

- Notice: Driver license changes and applications must be processed at an official DMV location.

- We are here to simplify the process of obtaining your [state] drivers license by providing you with up-to-date information

- [Website] is privately owned and is neither operated by, nor affiliated with, any government agency.

(OP-DE.440-1:134-135). Then, an easy-to-understand and interactive pop-up further appeared at each point of sale on the transaction sites:

- IMPORTANT NOTICE . . . . You agree that the site is privately owned and is neither operated by, nor affiliated with, any government agency . . . . The site provides helpful, time-saving information and downloads as a private value-add to services provided by [official government agency].

57

(OP-DE.440-1¶¶32, 57, 98 and *id.*:209). The transaction pages further stated:

- [Website] is in no way or fashion affiliated with any federal or local governmental agency or offices.

- The services we provide are available for free in the official sites or local offices.

- OBTAIN YOUR ROAD GUIDE

- Find out how to obtain a . . . license . . . by downloading our guide.

- [P]urchase . . . and download . . . [a] guide and resources.

- [Website] is a privately owned website and is not affiliated with any government agencies. The services we provide are available for free in the official sites or offices.

(OP-DE.440-1:121-122, 207).

Similarly, freemium landing pages confirmed:

- Let us help you find everything you need to know with our guide.

-  This site is privately owned and is neither affiliated with, nor endorsed by any government agency.

- Let us help you find everything you need to know with our guide.

58

(OP-DE.440-1:193-204). Freemium transaction sites contained the following disclosures:

- This site is privately owned and is neither affiliated with, nor endorsed by any government agency.

- This site is privately owned and is neither affiliated with, nor endorsed by, nor operated by, any government agency. We provide time saving information.

- Confirm your information to get your Eligibility Guide.

(*Id.*:292-298).

A reasonable fact-finder could conclude that these disclosures were effective in eliminating confusion, as the district court later acknowledged. (OP-DE.579:2 (stating that "that there was significant and credible anecdotal evidence to indicate that many of the customers either suffered no harm or were wholly satisfied with their experiences with the Defendants.")).

Indeed, these disclaimers did not come out of thin air, but were based on prevailing judicial opinions and the FTC's ***own consent orders*** in local courts. For instance, in *FTC v. DOTAuthority.com, et al.*, (S.D. Fla. 16-cv-62186-WJZ), the FTC sought injunctive relief against a company it alleged was posing as the Department of Transportation to sign consumers up for unwanted service fees. (*Id.*,

Dkt. 19). In pursuing relief under §5(a), the FTC sought (and the district court ordered) disclosures that were "easily noticeable" and "easily understandable." (*Id.*, Dkt. 48:5-7). The FTC consented to the following disclosures as sufficient to prevent confusion, *verbatim*:

- That Defendants are private third-party service providers offering their goods or services in exchange for a fee;

- In any solicitation or advertisement, the following statement: "This is a commercial solicitation and advertisement. [Insert name of Defendant] is NOT affiliated with any government authority"; and

- Before a Person submits any payment or billing information, the amount of the total charge that is attributable to Defendants' service fees.

(*Id.*, Dkt. 230-1). The disclosures utilized by OPG far exceeded these in quantity, substance and prominence.

Consistent with the FTC's position in *DOTAuthority*, courts have recognized that appropriate disclosures (particularly at the point of sale), can adequately dispel consumer confusion notwithstanding an earlier ambiguity. *See also Kurimski v. Shell Oil Co.*, 2022 WL 2913742, *7 (S.D. Fla. June 30, 2022) (dismissing consumer's lawsuit claiming deception at gas pump for omission of debit price next to cash and credit pricing, leading consumer to believe he would

60

be charged for the lower cash price, finding "that no reasonable consumer would be misled as to price when the price they will be charged is clearly presented during the transaction prior to the point of sale"); *Davis v. Portfolio Recovery Assocs., LLC*, 2021 WL 4133733, *7 (M.D. Fla. Sept. 10, 2021) (dismissing consumer's lawsuit against debt collector for misleadingly attempting to collect time-barred debt, reasoning that disclosure "we will not sue" rather than "cannot sue," when read in context, was sufficient to dispel confusion that consumer had to pay debt); *F.T.C. v. Direct Benefits Grp., LLC*, 2012 WL 5430989, *4 (M.D. Fla. Nov. 7, 2012) (denying FTC's motion for summary judgment in a case involving an online discount savings business, in which relevant websites had pop-up disclaimers where "no consumer could be enrolled in the programs without affirmatively checking a box or at least clicking an 'okay' button in response to a directive"); *In re Vistaprint Corp Mktg. & Sales Pracs. Litig.*, 2009 WL 2884727, *6 (S.D. Tex. Aug. 31, 2009) ("The VistaPrint Rewards webpage contains adequate disclosures which, if read by the consumer, prevent the webpage—as a matter of law—from being deceptive."). These cases suggest that reasonable people can disagree about the efficacy of the disclaimers, particularly in this case, given

61

the position the FTC has taken in contemporaneous cases in the Southern District of Florida.

Further undermining the propriety of summary judgment was evidence showing that the complaints asserted by the FTC represented an infinitesimally small fraction of OPG's business. The receiver stated: "evidence of chargebacks on OPG's websites were not high relative to the market and that there was a low volume of consumer complaints relative to the number of transactions," specifically; "[d]uring the 2017 through 2019 period, OPG sold nearly 5.5 million guides to consumers; of the 953 complaints received by the FTC as of June 25, 2019, two-thirds of the complainants did not purchase OPG products, and, of the remaining complainants, all but five received full refunds." (AQ-DE.200-24¶20). Freemium sites generated only 66 complaints to the FTC out of 15 million customers in a 5-year period. (OP-DE.440-1¶217; OP-DE.579:8). And the FTC's own witness established that on a global scale, chargebacks were typically less than 1.5%. (OP-DE.440-7:11-12). That is not even 2 consumers out of 100, and does not come close to supporting the inference, in the light most favorable to the nonmovants, that OPG's websites were "likely to mislead consumers acting reasonably . . . ."

*Tashman*, 318 F.3d at 1277. Repeat customers corroborated the inference of consumer satisfaction. (AQ-DE.127-2¶8).

And what of FTC's expert? Mazurek's lack of qualifications regarding the consumer perception survey (which she had no training in, and had never done before) rendered the surveys essentially worthless. Indeed, Mazurek's survey reduced the size of OPG's disclaimers by more than 50%, proceeded without controls, and was impermissibly suggestive, among other things. This report was adequately rebutted by Anderson, which was sufficient to generate a material issue.

The FTC also claimed that OPG engaged in "reputation management" by a combination of writing positive blogs, responding to consumer reviews, and reviewing its websites "as an objective third party." (OP-DE.455¶38). But that is not evidence of deception. Moreover, the FTC did not proffer the actual reviews, nor did it present a shred of evidence that any of OPG's consumers even saw those reviews. And even if this flimsy evidence could give rise to an inference of deception, in a summary judgment posture it would be insufficient to overcome the equally plausible inference that OPG undertook these efforts for reasons unconnected to deception,

63

namely, to clarify consumer perception or because it believed in the value of its offerings.

Finally, it should be noted that the receiver made OPG more money than ever after taking helm of the business and adopting the court-approved templates to supposedly eliminate confusion. Together with low chargeback and complaint rates even before the receiver's involvement, this is strong inferential proof that consumers actually wanted OPG's products and that their purchase decisions were not motivated by alleged government affiliation. *See Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 974 (7th Cir. 2020) (granting summary judgment to defendants in consumer lawsuit regarding deceptive labeling of product as "aloe vera" which contained "low concentrations of what plaintiffs maintain is an important therapeutic component" known as acemannan, reasoning that "the evidence does not give us reason to believe that consumers care about acemannan concentration").

Similar to the summary judgment concern in *Beardsall*, here the FTC's evidence did not demonstrate that consumers actually cared about government affiliation when interacting with OPG's websites rather than just wanting the guide or service offered. This

not only undercuts §5(a) deception, but completely destroys the causal link between the asserted misrepresentations and the sanction award.

## B. The *Acquinity* Injunction Was Invalid and Unlawful

Although factual conflict regarding deception is dispositive of both summary judgment orders on appeal, because this matter involves contempt in particular, due process requires that any residual doubts be resolved in favor of reversal.[13]

Against that backdrop, the FTC had a heavy lift: it had to prove, clearly and convincingly, as a matter of undisputed fact, that "the allegedly violated order was valid and lawful; . . . the order was clear and unambiguous; and the . . . alleged violator had the ability to comply with the order." *Leshin*, 618 F.3d at 1232.

Initially, the *Acquinity* injunction was impermissibly vague and invalid. Before a party may be held in contempt for violating an injunction, the injunction must describe in reasonable detail the

---

[13]    Generally speaking, "[s]ummary adjudication of indirect contempt is prohibited." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 833 (1994). If the court is faced with a material issue of fact, then due process requires . . . a hearing." *Mercer v. Mitchell*, 908 F.2d 763, 769 n.11 (citation omitted).

conduct that is prohibited. *See Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1531 (11th Cir. 1996) (holding that the "generalized language of the injunction, which in effect says nothing more than to 'obey the law,' is violative of the standard of specificity required by [Rule] 65(d)"). The *Acquinity* injunction was a paragon example of an "obey-the-law" injunction. In relevant part, Section II of the injunction barred the stipulating defendants from making "misrepresentations" and enjoined

> any false or misleading material representation . . . of any product or service, or concerning any consumer's obligation to pay for charges for any product or service.

(AQ-DE.132:3).[14]

As readily apparent, the order does not identify within its four corners what its subjects must actually do to comply other than requiring from them "compendious knowledge" of an "ever-changing judicial landscape." *SEC v. Goble*, 682 F.3d 934, 949 (11th Cir. 2012). The order "essentially informs the defendants not to violate Section 5

---

[14]     This was in clear contrast to the narrow requirements of Section I of the injunction which specifically proscribed "placing charges on telephone bills," *id.*, and which neither Katz nor Levison were accused of violating.

. . . which prohibits 'unfair or deceptive acts or practices in or affecting commerce,' a prohibition of boundless proportion," *FTC v. Washington Data Res.*, 2012 WL 2075827, *5 (M.D. Fla. June 8, 2012) (rejecting FTC's proposed injunction prohibiting the "misrepresentation of '[a]ny material aspect of the performance, efficacy, nature, or characteristics of [a] product, service, plan, or program'").

This Court has repeatedly "[gone] out of [its] way to condemn these injunctions," *Goble*, 682 F.3d at 949, and does not hesitate to vacate them. *Id.* (vacating portions of injunction as requiring respondent to look beyond the "four corners" and suggesting that injunction framed around §10(b) of the Exchange Act, prohibiting deceptive conduct, would be impermissibly vague); *see also LabMD, Inc. v. Fed. Trade Comm'n*, 894 F.3d 1221, 1236-1237 (11th Cir. 2018) (vacating injunction requiring implementation of "comprehensive information security program" because order "says precious little about how [compliance] is to be accomplished"); *SEC v. Smyth*, 420 F.3d 1225, 1233 n.14 (11th Cir. 2005) (concluding injunction was unenforceable, which prohibited "any untrue statement of a material fact or any omission to state a material fact");

*Burton v. City of Belle Glade*, 178 F.3d 1175, 1200 (11th Cir. 1999) (invalidating injunction prohibiting municipality from discriminating on basis of race in annexation decisions since it did "no more than instruct the City to 'obey the law'"); *Hughey*, 78 F.3d at 1531 (vacating injunction ordering defendants to stop discharging stormwater in violation of Clean Water Act, reasoning that it failed to "identify the acts" that defendant was required to do or refrain from doing); *Payne v. Travenol Labs., Inc.*, 565 F.2d 895, 899 (5th Cir. 1978) (invalidating injunction that prohibited defendant from violating Title VII in employment decisions).

Because the *Acquinity* order was invalid and unlawful, it could not supply the predicate for contempt. *See Smyth, supra.*

## C. Ability to Comply Was Materially Disputed

The district court further erred in refusing to weigh in Katz and Levison's favor the unrefuted evidence of their comprehensive efforts to comply with the "ever-changing judicial landscape" relevant to §5(a). Indeed, this lawsuit vividly illustrates the problem identified in *Goble*, *supra*, which is that even with three top-drawer law firms undertaking "comprehensive," "ongoing," and "large-scale" compliance review of all relevant websites to "ensure total

compliance" with applicable law, Katz and Levison still found themselves staring down the FTC's barrel. Furthermore, Katz and Levison observed a robust refund policy and staffed a call center to address consumer concerns.

This is not only proof positive of the amorphous standards of the *Acquinity* order, but equally demonstrates that Katz and Levison made all reasonable efforts to comply with it. *See Chairs v. Burgess*, 143 F.3d 1432, 1437 (11th Cir. 1998) (explaining that a noncomplying party will be absolved of contempt where he or she has made "has made 'in good faith all reasonable efforts to comply' with the terms of a court order.'" (citation omitted)); *Newman v. Graddick*, 740 F.2d 1513, 1525 (11th Cir. 1984) ("[A] person who attempts with reasonable diligence to comply with a court order should not be held in contempt."). Significantly, the receiver even hired Levison as a consultant, further evincing good faith. (OP-DE.169:7).

We acknowledge that advice-of-counsel is not a defense to contempt, but inability to comply ***is***—and this defense is satisfied by the "reasonable efforts" standard. *Chairs*, 143 F.3d at 1437. Just as in *Chairs*, here too "[t]he district court should have considered fully the [respondent's] ability (or inability) in the light of this 'reasonable

efforts' standard. By failing to demonstrate such consideration, the district court erred." *Id.* (vacating contempt for further proceedings).

Katz and Levison's evidence of comprehensive compliance efforts, particularly in the backdrop of a defectively vague injunction, was sufficient to generate a material issue, and the judge reversibly erred in failing to consider the evidence. *Id.* The trial judge further erred in excluding that evidence at the damages stage. (AQ-DE.232:2, and n.2). *See Taggart v. Lorenzen*, 139 S. Ct. 1795, 1802 (2019) ("A party's good faith, even where it does not bar contempt, may help to determine an appropriate sanction.").

### D. Levison Lacked Actual Notice of the *Acquinity* Injunction

Finally, "to hold a non-party to an order in civil contempt for a violation thereof, the non-party must have actual notice of the enjoined acts." *Blanco GmbH±Co. KG v. Vlanco Indus., LLC*, 992 F. Supp. 2d 1225, 1248 (S.D. Fla. 2014) (Rosenbaum, J.) (citing Fed. R. Civ. P. 65(d)(2)), *aff'd sub nom. Blanco GmbH %8F Co. KG v. Laera*, 620 F. App'x 718 (11th Cir. 2015); *see also Leshin*, 618 F.3d at 1235. Actual notice means ***actual notice***. But this standard was not applied. Rather, the district court netted Levison as by-catch in a $100 million contempt sanction based entirely on the fact that Katz,

during a casual interaction, raised an order in the air and mentioned to Levison that he settled the unrelated *Acquinity* lawsuit regarding mobile billing, a matter which Levison had absolutely nothing to do with and had no interest in.

Having notice of a settlement is not actual notice of an injunction. *E.g.*, *E.D. Systems Corp. v. Southwestern Bell Telephone Co.*, 674 F.2d 453, 459 (5th Cir. 1982) ("[M]ere rumors, vague statements, and circumstances that are dubious or equivocal and do no more than arouse suspicion or create speculation, are not sufficient . . . ." (citations omitted)). Nor does waiving an order in the air provide actual notice to all who might see it. *Cf. Reich v. United States*, 239 F.2d 134, 137–38 (1st Cir. 1956) (finding nonparty had actual notice where he "knew of its existence and knew its terms").

In effect, the district judge imputed to Levison a duty of investigation, failing which he would be deemed presumptively aware of the requirements of the *Acquinity* injunction. This understanding does not comport with the plain language of Rule 65(d)(2) or basic precepts of due process. Indeed, how would Levison have any idea he was supposed to do something, or refrain from doing something,

without knowledge of the contents of the order? The trial court deemed such knowledge irrelevant. (AQ-DE.225:5).

That error was magnified by the district court's failure to hold a hearing. Illustrating the significance of this failure, at the eventual trial, the district judge listened "very carefully and with a lot of skepticism to [co-defendant] Mr. Rothman's trial testimony" and despite the initial skepticism, ultimately accepted Rothman's testimony and directed a verdict in his favor, finding lack of notice. (OP-DE.594:153). Levison never had that opportunity. *See Consumer Fin. Prot. Bureau v. Howard L., P.C.*, 671 F. App'x 954, 956 (9th Cir. 2016) (reversing for evidentiary hearing regarding scope of actual notice, underscoring that "[c]ivil contempt actions are 'in the nature of a trial,' and thus come within the 'preference for use of oral testimony in open court'" (citation omitted)).

At minimum, whether Levison had actual notice by clear and convincing evidence was highly debatable. Because a fact issue was presented for which live testimony was required, this matter must be reversed.

### E. Judicial Reassignment is Warranted

Should this Court remand for further proceedings, judicial reassignment is warranted. *See United States v. Torkington,* 874 F.2d 1441, 1446 (11th Cir. 1989) ("Reassignment is appropriate where the trial judge has engaged in conduct that gives rise to the appearance of impropriety or a lack of impartiality in the mind of a reasonable member of the public."). Here, respectfully, the district judge's appearance of impartiality is irretrievably tainted by having crystalized his view on the merits after a subsequent bench trial. The trial verdict reaffirmed, in a highly consistent fashion, the district court's earlier findings at the TRO, preliminary injunction, and summary judgment stages over the past 3 years. The judge viewed defense testimony "with a lot of skepticism" following the grant of injunctive relief. (OP-DE.594:152-153). A reasonable person would have justifiable and serious doubts about the trial court's ability to take a dispassionate view of the evidence. And it is fair to say, objectively speaking, that the judge would have substantial difficulty in doing so.

Furthermore, reassignment would not entail any significant duplication of effort since discovery was closed and the case ended

in a full-blown trial. As such, there is no pretrial litigation remaining and a successor judge would not be required to do anything more than his or her predecessor, which is to simply try the case on liability. Historical knowledge of the case would not advance judicial economy in this unique scenario.

# CONCLUSION

The compensatory contempt sanction and permanent injunction should be reversed.

Dated: July 24, 2023.

Respectfully submitted,

By:*/s/ Marlon J. Weiss      .*
Marlon J. Weiss, Esq.
Fla. Bar No. 49057
mweiss@atllp.com
miamiefiling@atllp.com

ARMSTRONG TEASDALE LLP
355 Alhambra Circle, Suite 1250
Coral Gables, FL  33134
Telephone:305-371-8809
Fax:305-448-4155

*Counsel for Defendants-Appellants
Burton Katz and Brent Levison*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing complies with the length limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it is 12,882 words, excluding the parts that are exempted under Rule 32(f). It complies with the typeface and type-style requirements of Rule 32(a)(5) and Rule 32(a)(6) because it is printed in 14-point Bookman Old Style font, a proportionally spaced typeface with serifs.

/s/ Marlon J. Weiss
Marlon J. Weiss

*Attorney for Defendants-Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 24, 2023, a true and correct copy of the foregoing was filed via the Court's CM/ECF system and served via electronic filing upon all counsel of record in this case.

/s/ Marlon J. Weiss
Marlon J. Weiss

*Attorney for Defendants-Appellants*