No. 23-11197

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

FEDERAL TRADE COMMISSION,
*Plaintiff-Appellee*,

v.

BURTON KATZ, et al.,
*Defendants-Appellants*.

On Appeal from the United States District Court
for the Southern District of Florida
1:19-cv-25046-RNS (Hon. Robert N. Scola, Jr.)

## BRIEF OF THE FEDERAL TRADE COMMISSION

ANISHA S. DASGUPTA
*General Counsel*

MARIEL GOETZ
*Acting Director of Litigation*

Of Counsel:
SARAH WALDROP
SANA CHAUDHRY
CHRISTOPHER ERICKSON
*Attorneys*

FEDERAL TRADE COMMISSION
Washington, D.C. 20580

BRADLEY DAX GROSSMAN
*Attorney*

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
(202) 326-2994
bgrossman@ftc.gov

No. 23-11197 (11th Cir.)
Federal Trade Commission v. Burton Katz, et al.

**Eleventh Circuit Rule 26.1 Certificate of Interested Persons**

Pursuant to Eleventh Circuit R. 26.1-1, Plaintiff-Appellee, the Federal Trade Commission, certifies that in addition to the names listed in Appellants' opening brief, the following attorneys, persons, associations of persons, firms, partnerships, or corporations have an interest in the outcome of this appeal.

9283-5503 QUEBEC, INC. (Corporate affiliate identified in defendants' compliance report dated December 8, 2022).

AAA 2012 Trust (Member of Dragon Global Holdings LLC).

Adam Rioux, LLC (Corporate affiliate identified in defendants' compliance report dated December 8, 2022).

Aero Buster Industries LLC (DBA for defendant Direct Market LLC).

Bergman, Michael (Counsel for the Federal Trade Commission).

BRTR Consulting (Corporate affiliate identified in defendants' compliance report dated December 8, 2022).

Dasgupta, Anisha S. (FTC General Counsel).

Dejaj Media (Corporate affiliate identified in defendants' compliance report dated December 8, 2022).

DEJT Holdings (Corporate affiliate identified in defendants' compliance report dated December 8, 2022).

No. 23-11197 (11th Cir.)
Federal Trade Commission v. Burton Katz, et al.

DiFalco, Fernandez & Kaplan (Counsel for Defendants Arlene Mahon and Waltham Technologies LLC).

DM Direct Market Solutions LLC (DBA for defendant Direct Market LLC).

DMV Web Management, Inc. (Corporate affiliate identified in defendants' compliance report dated December 8, 2022).

Dragon Global Management LP (Affiliate of Defendants).

Financial Guide, LLC (Corporate affiliate identified in defendants' compliance report dated December 8, 2022).

Foodstamps Help, LLC (Corporate affiliate identified in defendants' compliance report dated December 8, 2022).

Goetz, Mariel (Counsel for the Federal Trade Commission).

Government Assistance Online, LLC (Corporate affiliate identified in defendants' compliance report dated December 8, 2022).

Health Benefits, LLC (Corporate affiliate identified in defendants' compliance report dated December 8, 2022).

Housing Advice, LLC (Corporate affiliate identified in defendants' compliance report dated December 8, 2022).

Housing Benefits, LLC (Corporate affiliate identified in defendants' compliance report dated December 8, 2022).

No. 23-11197 (11th Cir.)
Federal Trade Commission v. Burton Katz, et al.

Jaco Beach, Ltd. (Corporate affiliate identified in defendants' compliance report dated December 8, 2022).

JourneyMan Media, LLC (Corporate affiliate identified in defendants' compliance report dated December 8, 2022).

Kelley, Mark W. (Counsel for Defendants).

Lacy Industries LLC (DBA for defendant Direct Market LLC).

Lady Boss Media, LLC (Corporate affiliate identified in defendants' compliance report dated December 8, 2022).

Marcus, Joel (Former counsel for the Federal Trade Commission).

Medicare Assistance, LLC (Corporate affiliate identified in defendants' compliance report dated December 8, 2022).

My Senior Assistance, LLC (Corporate affiliate identified in defendants' compliance report dated December 8, 2022).

Nextsteplocal, LLC, D/B/A Next Step Local (Corporate affiliate identified in defendants' compliance report dated December 8, 2022).

Nextstepsocial, LLC D/B/A Next Step Social (Corporate affiliate identified in defendants' compliance report dated December 8, 2022).

Ocotillo Media LLC (Corporate affiliate identified in defendants' compliance report dated December 8, 2022).

No. 23-11197 (11th Cir.)
Federal Trade Commission v. Burton Katz, et al.

On Point Safety Services, LLC (Corporate affiliate identified in defendants' compliance report dated December 8, 2022).

Online Financial Assistance, LLC (Corporate affiliate identified in defendants' compliance report dated December 8, 2022).

Pacific Avenue Media, LLC (Corporate affiliate identified in defendants' compliance report dated December 8, 2022).

Pelron, S.A. (Corporate affiliate identified in defendants' compliance report dated December 8, 2022).

Raftaar Media LLC (Corporate affiliate identified in defendants' compliance report dated December 8, 2022).

Reggie Industries LLC (DBA for defendant Direct Market LLC).

Sakura Industries LLC (DBA for defendant Direct Market LLC).

SECTION8 Information, LLC (Corporate affiliate identified in defendants' compliance report dated December 8, 2022).

SEC8 Portal, LLC (Corporate affiliate identified in defendants' compliance report dated December 8, 2022).

Section 8 Portal, LLC (Corporate affiliate identified in defendants' compliance report dated December 8, 2022).

Smith, Currie & Hancock LLP (Counsel for Defendants Arlene Mahon and Waltham Technologies LLC).

Federal Trade Commission v. Burton Katz, et al.

Tag Media, LLC (Corporate affiliate identified in defendants' compliance report dated December 8, 2022).

Unemployment Guidance, LLC (Corporate affiliate identified in defendants' compliance report dated December 8, 2022).

Veteran Assistance, LLC (Corporate affiliate identified in defendants' compliance report dated December 8, 2022).

Wellness Guide, LLC (Corporate affiliate identified in defendants' compliance report dated December 8, 2022).

Wolfe, Douglas (Counsel for the Federal Trade Commission).

Your Passport Now, LLC (Corporate affiliate identified in defendants' compliance report dated December 8, 2022).

Yula Capital LLC (Corporate affiliate identified in defendants' compliance report dated December 8, 2022).

The Federal Trade Commission further states that, to the best of its knowledge, no publicly traded company or corporation has an interest in the outcome of this case or appeal.

## STATEMENT REGARDING ORAL ARGUMENT

The Federal Trade Commission believes that the facts and legal arguments are adequately presented in the briefs and record, that all of appellants' arguments are contrary to binding precedent or undisputed evidence, and that many of those arguments are waived and moot.

The Commission therefore believes that the decisional process will not be significantly aided by oral argument, and that prompt resolution of this matter on the briefs best ensures efficient and appropriate use of judicial and government resources. *See* 11th Cir. R. 34-3(a), (b)(3); Fed. R. App. P. 34(a)(1), (2)(C).

## TABLE OF CONTENTS

Statement Regarding Oral Argument ...................................................................i

Table Of Contents ............................................................................................ ii

Table Of Authorities .......................................................................................iv

Preliminary Statement .......................................................................................1

Jurisdictional Statement ....................................................................................3

Statement Of Issues ...........................................................................................4

Statement Of The Case ......................................................................................4

    A.   Katz's Phone Bill Scam And Permanent Injunction.................................4

    B.   Katz And Levison's Government Services Scam .......................................5

        1.   False Offers To Provide Government Services.................................6
        2.   False Offers To Determine Eligibility For Benefits .........................11

    C.   The FTC's Statutory And Contempt Actions ...........................................14

    D.   Summary Judgment Rulings .......................................................................16

    E.   Post-Trial Rulings And Remedy Administration.......................................17

Standard Of Review ........................................................................................19

Summary Of Argument....................................................................................20

Argument..........................................................................................................24

I.    The District Court Correctly Held That Katz And Levison's
    Websites Were Deceptive...........................................................................24

    A.   The Websites Deceptively Promoted Government Services
        And Eligibility Determinations....................................................................25

        1.   The Websites Were Misleading On Their Face ...................................26
        2.   Undisputed Evidence Confirms That Consumers Were
            Misled..................................................................................................32

3.   Katz and Levison's Defenses Are Immaterial And Meritless .................................................................................36

B.   The Misrepresentations Were Material....................................38

II.   Katz And Levison's Appeal From The Contempt Rulings Is Waived, Fails For Lack Of Article III Jurisdiction, And Is Baseless On The Merits ....................................................................40

A.   Katz And Levison Waived And Mooted Their Appeal By Persuading The District Court To Execute The Remedy ...........41

B.   The District Court Correctly Held Katz And Levison In Contempt..................................................................................45

1.   Levison Had Actual Notice Of The *Acquinity* Injunction .................45
2.   The Injunction Was Valid And Lawful................................49
3.   Katz and Levison Cannot Show That They Made All Reasonable Efforts To Comply........................................54

C.   The Monetary Sanctions Were Not An Abuse Of Discretion ....................56

III.  Judicial Reassignment Is Unwarranted............................................62

Conclusion ..................................................................................62

# TABLE OF AUTHORITIES[*]

## CASES

*Access Now, Inc. v. Sw. Airlines Co.*,
  385 F.3d 1324 (11th Cir. 2004) ................................................. 37, 39

*Acheron Capital, Ltd. v. Mukamal*,
  22 F.4th 979 (11th Cir. 2022) .............................................................18

*ADT LLC v. NorthStar Alarm Servs., LLC*,
  853 F.3d 1348 (11th Cir. 2017) .........................................................46

*AMG Capital Management, LLC v. FTC*,
  141 S. Ct. 1341 (2021) ........................................................ 15, 36, 57

*Blanco GmbH + Co. v. Laera*,
  620 F. App'x 718 (11th Cir. 2015) .....................................................47

*Blanco GmbH + Co. v. Vlanco Indus., LLC*,
  642 F. App'x 934 (11th Cir. 2016) .....................................................50

*Blanco GmbH + Co. v. Vlanco Indus.*, LLC,
  992 F. Supp. 2d 1225 (S.D. Fla. 2014) ..............................................47

*Bonner v. City of Prichard*,
  661 F.2d 1206 (11th Cir. 1981) .........................................................27

*Burton v. City of Belle Glade*,
  178 F.3d 1175 (11th Cir. 1999) .........................................................52

*CFTC v. Escobio*,
  946 F.3d 1242 (11th Cir. 2020) .........................................................43

*Direct Mktg. Concepts, Inc.*,
  624 F.3d 1 (1st Cir. 2010)...................................................................29

*Dystar Corp. v. Canto*,
  1 F. Supp. 2d 48 (D. Mass. 1997) ......................................................47

*Ellis v. England*,
  432 F.3d 1321 (11th Cir. 2005) .........................................................35

*Erco Indus., Ltd. v. Seabord Coast Line R.R. Co.*,
  644 F.2d 424 (5th Cir. May 1981) .....................................................27

---

[*] Cases and other authorities principally relied upon are marked with asterisks.

*Fanning v. FTC,*
   821 F.3d 164 (1st Cir. 2016) ........................................................ 25, 39

*Flournoy v. CML-GA WB, LLC,*
   851 F.3d 1335 (11th Cir. 2017) ................................................... 19, 20

*Ford ex rel. Estate of Ford v. Garcia,*
   289 F.3d 1283 (11th Cir. 2002) ...........................................................42

*FTC v. AMG Cap. Mgmt., LLC,*
   910 F.3d 417 (9th Cir. 2018)................................................................36

*FTC v. Brown & Williamson Tobacco Corp.,*
   778 F.2d 35, (D.C. Cir. 1985) ............................................... 25, 31, 35

*FTC v. Colgate-Palmolive Co.,*
   380 U.S. 374 (1965).............................................................................54

*FTC v. Commerce Planet, Inc.,*
   815 F.3d 593 (9th Cir. 2016)...............................................................58

*\*FTC v. Cyberspace.Com, LLC,*
   453 F.3d 1196 (9th Cir. 2006) ........................................... 26, 32, 37

*FTC v. DOTAuthority.com, Inc.,*
   No. 0:16-cv-62186-WJZ, Dkt. No. 230-1 (S.D. Fla.
   Mar. 16, 2018)......................................................................................38

*FTC v. E.M.A. Nationwide, Inc.,*
   767 F.3d 611 (6th Cir. 2014)........................................................ 26, 28

*FTC v. EDebitPay, LLC,*
   695 F.3d 938 (9th Cir. 2012)....................................................... 50, 53

*FTC v. Freecom Communications, Inc.,*
   401 F.3d 1192 (10th Cir. 2005) ..........................................................36

*FTC v. IAB Mktg. Assocs., LP,*
   746 F.3d 1228 (11th Cir. 2014) .........................................................25

*FTC v. Kuykendall,*
   371 F.3d 745 (10th Cir. 2004) ..................................................... 59, 60

*\*FTC v. Leshin,*
   618 F.3d 1221 (11th Cir. 2010) ..................... 20, 45, 46, 55, 56, 59, 60

*\*FTC v. Leshin,*
   719 F.3d 1227 (11th Cir. 2013) ............................... 57, 59, 60, 61

*FTC v. Nat'l Urological Grp, Inc.*,
   80 F.4th 1236 (11th Cir. 2023) ................................................ 3, 24, 57

*FTC v. Nat'l Urological Grp., Inc.*,
   786 F. App'x 947 (11th Cir. 2019) ........................................ 50, 53, 54

*FTC v. Neiswonger*,
   494 F. Supp. 2d 1067 (E.D. Mo. 2007) ................................................47

*FTC v. Neiswonger*,
   580 F.3d 769 (8th Cir. 2009) ................................................47

*FTC v. On Point Capital Partners LLC*,
   17 F.4th 1066 (11th Cir. 2021) ............................... 2, 15, 24, 27, 32, 39

*FTC v. Pantron I Corp.*,
   33 F.3d 1088 (9th Cir. 1994) ................................................37

*FTC v. Tashman*,
   318 F.3d 1273 (11th Cir. 2003) ................................................36

*FTC v. Trudeau*,
   579 F.3d 754 (7th Cir. 2009) ................................................ 55, 60

*FTC v. USA Financial, LLC*,
   415 F. App'x 970 (11th Cir. 2011) ................................................26

*FTC v. WV Universal Mgmt., LLC*,
   877 F.3d 1234, 1237 (11th Cir. 2017) ................................................33

*Hughey v. JMS Development Corp.*,
   78 F.3d 1523, (11th Cir. 1996) ................................................52

*In re Roth*,
   935 F.3d 1270 (11th Cir. 2019) ................................................ 20, 49

*Jennifer Matthew Nursing & Rehab. Ctr. v. HHS*,
   607 F.3d 951 (2d Cir. 2010) ................................................43

*Kimberly Regenesis, LLC v. Lee Cnty.*,
   64 F.4th 1253, 1260 (11th Cir. 2023) ................................................44

*Kraft, Inc. v. FTC*,
   970 F.2d 311 (7th Cir. 1992) ................................................25

*LabMD, Inc. v. FTC*,
   894 F.3d 1221 (11th Cir. 2018) ................................................52

*Leigh v. Warner Bros, Inc.*,
   212 F.3d 1210 (11th Cir. 2000) ................................................34

*Levine v. Comcoa Ltd.*,
   70 F.3d 1191, 1194 (11th Cir. 1995) ..................................................50

*Link v. Wabash RR Co.*,
   370 U.S. 626 (1962) .........................................................................56

*Liu v. SEC*,
   140 S. Ct. 1936 (2020) ............................................................... 59, 61

*McComb v. Jacksonville Paper Co.*,
   336 U.S. 187 (1949) ............................................... 50, 54, 55, 57

*McGregor v. Chierico*,
   206 F.3d 1378 (11th Cir. 2000) ................................................ 55, 59

*Orkin Exterminating Co. v. FTC*,
   849 F.2d 1354 (11th Cir. 1988) ................................................ 32, 37

*Payne v. Travenol Labs., Inc.*,
   565 F.2d 895 (5th Cir. 1978) ...........................................................52

*Planetary Motion, Inc. v. Techsplosion, Inc.*,
   261 F.3d 1188 (11th Cir. 2001) ......................................................53

*PlayNation Play Sys., Inc. v. Velex Corp.*,
   939 F.3d 1205 (11th Cir. 2019) ...................................................3, 55

*POM Wonderful, LLC v. FTC*,
   777 F3d 478 (D.C. Cir. 2015) .........................................................36

*Regal Knitwear Co. v. NLRB*,
   324 U.S. 9 (1945) ...................................................................... 46, 50

*Reliance Ins. Co. v. Mast Constr. Co.*,
   159 F.3d 1311 (10th Cir. 1998) .......................................................47

*RES-GA Cobblestone, LLC v. Blake Construction &*
   *Development, LLC*,
   718 F.3d 1308 (11th Cir. 2013) .......................................................43

*Reynolds v. Roberts*,
   202 F.3d 1303 (11th Cir. 2000) ......................................................50

*San Francisco Residence Club, Inc. v. 7027 Old Madison*
   *Pike, LLC*,
   583 F.3d 750 (11th Cir. 2009) ........................................................44

*SEC v. Bilzerian*,
   410 F. App'x 346 (D.C. Cir. 2010) ................................................48

*SEC v. Bilzerian*,
  613 F. Supp. 2d 66 (D.D.C. 2009) .......................................................48

*SEC v. Capital Consultants, LLC*,
  397 F.3d 733 (9th Cir. 2005) ..............................................................45

*SEC v. Goble*,
  682 F.3d 934 (11th Cir. 2012) ...................................................... 52, 53

*SEC v. McNamee*,
  481 F.3d 451 (7th Cir. 2007) ...............................................................56

*SEC v. Smyth*,
  420 F.3d 1225 (11th Cir. 2005) ..........................................................52

*SEC v. Torchia*,
  922 F.3d 1307 (11th Cir. 2019) ..........................................................43

*SEC v. Wozniak*,
  33 F.3d 13 (7th Cir. 1994) ...................................................................45

*Spallone v. United States*,
  493 U.S. 265 (1990) ...............................................................................3

*Stargel v. SunTrust Banks, Inc.*,
  791 F.3d 1309 (11th Cir. 2015) ..........................................................62

*Taggart v. Lorenzen*,
  139 S. Ct. 1795 (2019) .........................................................................55

*Thomas v. Tenneco Packaging Co.*,
  293 F.3d 1306 (11th Cir. 2002) ..........................................................20

*United States v. Baker*,
  641 F.2d 1311 (9th Cir. 1981) .............................................................47

*United States v. Balint*,
  201 F.3d 928 (7th. Cir. 2000) ...................................................... 42, 43

*United States v. Brannan*,
  562 F.3d 1300 (11th Cir. 2009) ................................................... 41, 42

*United States v. United Mine Workers*,
  330 U.S. 258 (1947) .............................................................................59

**STATUTES**

15 U.S.C. § 45 ...........................................................................................3

15 U.S.C. § 53 ......................................................................................3, 15

15 U.S.C. § 78 ..................................................................59

28 U.S.C. § 1291 ...............................................................3

28 U.S.C. § 1331 ...............................................................3

28 U.S.C. § 1337 ...............................................................3

28 U.S.C. § 1345 ...............................................................3

**RULES**

Fed. R. App. P. 4 ...............................................................4

Fed. R. Civ. P. 56 .............................................................20

Fed. R. Civ. P. 58 .............................................................4

*Fed. R. Civ. P. 65 ............................................... 46, 51, 53

## PRELIMINARY STATEMENT

Burton Katz and Brent Levison were co-owners and key executives of On Point Global, which created and maintained websites that falsely promised to render government services such as license renewals for a fee, or to determine consumers' eligibility for public benefits in return for personal data.  Instead of delivering the services, On Point provided consumers with PDF documents containing generic, publicly available information; it then sold the personal data to other scammers.  The company reaped more than $102 million from this scheme.

These were not Katz's first scam websites.  Before On Point, he operated websites that falsely offered free merchandise in exchange for consumers' phone numbers and then placed unauthorized charges on victims' phone bills.  In 2014, Katz agreed to a permanent injunction with the FTC barring future misrepresentations; he then showed the order to Levison, On Point's General Counsel and Senior Vice President of Products.

In 2019, the FTC filed suit against Katz, Levison, and On Point, alleging that the deceptive On Point websites violated the FTC Act and the 2014 injunction.  In 2021, the district court granted summary judgment for the FTC, found the defendants in contempt of the 2014 injunction, and held them jointly and severally liable for compensatory sanctions in an amount to be established through an opt-in victim-claims process.  Katz and Levison *endorsed* this remedy, asking the court to

execute the claims process without delay—which the court did.  In March 2023, the court entered an order confirming that the claims process was complete and that nearly all claimants had been repaid.

Katz and Levison—but not On Point—now appeal that order.  They argue that *no* remedies were appropriate: a position they waived by arguing the opposite below.  They likewise contest the sanctions amount, but that issue is moot now that the money has been distributed to consumers.  In any event, the judgment did not touch Katz or Levison's personal assets, so neither is injured by the sanctions.  And because they have suffered no concrete and redressable injury, Katz and Levison lack appellate standing.

Katz and Levison's arguments also fail on the merits.  The On Point websites contained explicit, false promises to perform government services; and any disclaimers were difficult to read, impossible to understand, and insufficient to dispel consumers' confusion.  This Court recognized as much when affirming the district court's earlier entry of a preliminary injunction.  *See FTC v. On Point Capital Partners LLC*, 17 F.4th 1066, 1080 (11th Cir. 2021).  Katz and Levison cite nothing in the record that could lead a reasonable factfinder to conclude otherwise.  Nor do they dispute that they controlled and knew of the deception.

The deceptive websites violated the 2014 injunction, and the district court correctly held Katz and Levison in contempt of that injunction.  Although Katz and

2

Levison attempt to blame their attorneys, they concede that there is no advice-of-counsel defense to civil contempt, which does not turn on intent. More broadly, Katz and Levison contend that courts may not award sanctions for violations of orders imposed under the FTC Act. But since they filed their brief, this Court rejected that very claim. *See FTC v. Nat'l Urological Grp, Inc.*, 80 F.4th 1236, 1243 (11th Cir. 2023). The Court should affirm in full.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over the Commission's claims under 15 U.S.C. §§ 45(a) and 53(b), and 28 U.S.C. §§ 1331, 1337(a) and 1345. The court had jurisdiction to enter the contempt judgment given its inherent power to enforce compliance with its own decrees. *See Spallone v. United States*, 493 U.S. 265, 276 (1990).

This Court has jurisdiction under 28 U.S.C. § 1291 based on the district court's March 14, 2023, order confirming that the defendants were liable for $19.6 million in civil contempt sanctions. OP-DE.666.[1] That order rendered the sanctions no longer "conditional or subject to modification." *PlayNation Play Sys., Inc. v. Velex Corp.*, 939 F.3d 1205, 1212 (11th Cir. 2019) (cleaned up). Because the court did not enter judgment in a separate document, *see* Fed. R. Civ.

---

[1] We cite the *On Point* docket entries as "OP-DE.___" and the contempt docket entries as "AQ-DE.___."

P. 58(a), the order became appealable 150 days later, on August 11, 2023. *See*

Fed. R. Civ. P. 58(c); Fed. R. App. P. 4(a)(2), 4(a)(7)(A).

There is no Article III jurisdiction over Katz and Levison's appeal from the

contempt rulings. As outlined in Point II.A, those claims are moot and Katz and

Levison lack appellate standing to raise them.

## STATEMENT OF ISSUES

The questions presented are:

1. Whether the district court correctly granted summary judgment for the

FTC when ruling the websites materially deceptive under the FTC Act.

2. Whether Katz and Levison's appeal from the district court's contempt

rulings and award of compensatory sanctions is waived, fails for lack of Article III

jurisdiction, or is otherwise meritless.

3. Whether this case should be reassigned to a new district judge.

## STATEMENT OF THE CASE

**A.    Katz's Phone Bill Scam And Permanent Injunction**

In a 2014 case called *Acquinity Interactive*, Katz stipulated to a permanent

injunction resolving the FTC's allegations that he deceptively placed charges on

consumers' phone bills in violation of the FTC Act. AQ-DE.132. Katz's

operation ran websites that falsely offered consumers free goods for their phone

numbers and enrolled them in unwanted text messaging services that charged

monthly fees. AQ-DE.88¶¶18-19, 44-47, 66-68. The stipulated injunction bars

4

Katz and persons in "active concert or participation" with him from "making, or assisting others in making, expressly or by implication, any false or misleading material representation, including representations concerning the cost, performance, efficacy, nature, characteristics, benefits, or safety of any product or service, or concerning any consumer's obligation to pay for charges for any product or service."  AQ-DE.132 at 3.

Levison was not named in the injunction, but testified that Katz told him about the injunction and that Levison saw the document "when it was resolved or when it got entered into."  AQ-DE 178-46 at 100-03.

## B.    Katz And Levison's Government Services Scam

The injunction did not stop Katz and Levison from deceiving consumers. They co-founded On Point Global,[2] which operated a sprawling network of websites that deceptively promised consumers government services in exchange for money or sensitive personal information.  Katz was On Point's CEO, a top-two shareholder, and the architect of its business plan.[3]  Levison was On Point's fourth-

---

[2] OP-DE.455¶136; OP-DE.472¶136.

[3] OP-DE.455¶¶137-38, 143; OP-DE.472¶¶137-38, 143; OP-DE.440-41 at 51-72; OP-DE-440-30 at 58-84; OP-DE.440-39 at 325-29.

largest shareholder, Chief Administrative Officer, Senior Vice President of

Products, and General Counsel.[4]

### 1.    False Offers To Provide Government Services

On Point told consumers that, for a fee, it would renew their driver's

licenses, register their automobiles, or help them obtain fishing licenses, but it

instead only gave them a PDF document with general information about the

service they sought.

On Point targeted consumers looking for government websites, paying

Google and Bing to display sponsored links to its sites when consumers searched

for "dmv.pa.gov," "renew Florida driver's license online," and similar terms.[5]  The

links directed consumers to On Point's state-specific websites, such as

floridadriverslicenses.org, which featured an image of the state's border, the text,

"Your source for [state] driver's information," and links referencing state services,

like "New License" and "Renew."[6]  On Point also operated DMV.com, which

displayed the headline "The DMV Made Easier" and featured links to "Renew

your License" and "Renew Car Registration."[7]  DMV.com's Facebook page

---

[4] OP-DE.455¶¶137-38, 207; OP-DE.472¶¶137-38, 207; OP-DE 78-2 at 2.

[5] OP-DE.440-56 at 20-29; OP-DE.440-1¶¶42-43, 79-80; OP-DE.440-30 at 245.

[6] OP-DE.440-1 at 134-43.

[7] OP-DE.440-1 at 84.

advertised, "you can renew you [sic] driver licenses online here!!  Skip the lines doing it from you [sic] home."[8]

DMV.com and the state-specific sites redirected visitors to other On Point sites, which sought consumers' billing information.[9]  These sites, including license-driver.com, presented themselves as a "comprehensive resource for all you [sic] driver license-related services" on a landing page like this one:



---

[8] OP-DE.440-2 at 303-04.

[9] OP-DE.440-1 ¶¶28-29, 42-43, 54; *id.* at pp. 207-10, 219-22, 264-66.

OP-DE.440-1 at 207, 219, 266.  Consumers saw a large, bold headline, "**Renew Drivers License In Your State**," next to which these words appeared in orange capital letters: "GET ALL THE INFORMATION TO COMPLETE THE PROCESS NOW."

Sometimes, consumers reached one of On Point's billing sites directly (without clicking through another On Point site), encountering a page like this one:



*E.g.*, OP-DE.440-1 at 121-32.  That page featured a prominent headline, "Select a Service and State Below to Start," and provided boldfaced, checkbox options to "Renew Driver's License," "Replace Driver's License," and "Reinstate Suspended License."

But the sites did not provide those services.[10] On Point charged consumers' credit cards, and consumers got at most a PDF "guide" containing general information about state services; some received nothing at all.[11]

The websites provided some disclaimers, which On Point knew were ineffective. On Point acknowledged to a credit-card processor in a "Fraud Reduction Plan" that "we still encounter confusion from customers" despite the disclaimers.[12]

Indeed, hundreds of consumers complained to the government, explaining that they perceived the websites as promising actual state services, not just guides.[13] Many consumers successfully disputed their credit-card charges and obtained chargebacks to recoup their payments.[14] Credit-card processors set thresholds for chargeback totals and ratios to detect potential fraud; On Point

---

[10] On Point operated separate websites that actually did provide services; they are not the subject of this action. *See* OP-DE.108 at 20-21.

[11] OP-DE.440-1¶¶36-38, 48, 60-61; *id.* at pp. 226-60.

[12] OP-DE.440-14 at 20.

[13] OP-DE.440-1¶11; OP-DE.440-7¶24; *id.* at pp. 58-60; OP-DE.440-18 at 1-39.

[14] OP-DE.440-9¶9; OP-DE 440-7¶18; *id.* at pp. 11-56.

constantly breached those thresholds.[15]  Several processors terminated accounts.[16]
Search engines also suspended traffic to On Point's sites due to misleading
content.[17]

On Point responded by suppressing evidence of deceived consumers.  The
company directed employees to write fake reviews posing "as an objective third
party" satisfied with the "PAID GUIDE" they received,[18] in order to bury reviews
from people claiming they had been "scam[med]."[19]  On Point also sought to evade
credit-card processors' fraud-detection thresholds through "load balancing"—
creating companies selling an identical product on numerous websites to reduce
chargebacks on any given site.[20]  In addition, On Point deflated chargeback ratios
by dividing charges into two installments (often $3.99 and $19.99) and seeking $1

---

[15] OP-DE.440-9¶¶10-13; OP-DE.440-39 at 1-2, 393-95; OP-DE.440-26 at 83, 137-39.

[16] OP-DE.440-13 at 1-4, 43, 176-79; OP-DE.440-14 at 9, 31-32.

[17] OP-DE.440-40 at 50-55; OP-DE.440-42 at 15, 56-57.

[18] OP-DE.440-40 at 1, 28-29, 42-43, 45, 182-83; OP-DE.440-39 at 287.

[19] OP-DE.440-39 at 411.

[20] OP-DE.440-9¶¶14-15, 21; OP-DE.440-14 at 9, 31; OP-DE.440-13 at 171-75.

charitable contributions, knowing that consumers would rarely dispute the smaller amounts.[21]

These deceptive websites reaped over $85 million (net of refunds and chargebacks) between 2017 and 2019 and were On Point's largest revenue source.[22]

### 2.    False Offers To Determine Eligibility For Benefits

On Point also operated dozens of websites targeting indigent, sick, and elderly people with fake offers to determine their eligibility for housing assistance, food stamps, Medicaid, or veterans' and unemployment benefits.[23]  On Point called these its "freemium" sites.[24]

For example, when consumers searched Google for information about Section 8 housing, they would see a sponsored link to Section-8housing.org and the language, "Check Your Eligibility for Section 8 housing."[25]  Once consumers

---

[21] OP-DE.440-9¶¶16-19; OP-DE.440-1¶¶34, 39, 46, 49, 56, 62; OP-DE.440-18 at 2-3, 20, 26; OP-DE.440-40 at 297.

[22] OP-DE.440-56 at 8; OP-DE.437-3 at 117-18; OP-DE.108-4; OP-DE.108-5.

[23] OP-DE.440-1¶25; *id.* at pp. 193-204; OP-DE.440-3 at 85-86; OP-DE.440-2 at 85-96, 99-104, 107-32.

[24] OP-DE.78-2¶7.

[25] OP-DE.440-56 at 11-12; *see also id.* at 9-10.

clicked the link, the website invited them to "**Find Out If You Are Eligible for the Section 8 Program**" and sought their names, email addresses, and zip codes.



OP-DE.440-1 at 288.

If a consumer clicked "Continue," the site solicited the consumer's phone number, birth date, gender, employment status, health insurance coverage status, medical diagnoses, disability status, debt level, and information about the need for low-income medical assistance.[26]  For example:

---

[26] OP-DE.440-1 at 289-305.



OP-DE.440-1 at 294.

Consumers who answered those questions—providing highly sensitive personal information to On Point—then learned that the sites did not determine eligibility.[27]  Consumers received only a PDF document with publicly available information untailored to the sensitive data provided.[28]

Similar to On Point's licensing websites, the public-benefit sites stated in small text at the page's top and bottom that "[t]he site is privately owned and is

---

[27] OP-DE.440-1 ¶¶76, 121; OP-DE.440-38 at 339-40.

[28] OP-DE.440-1 ¶¶74-75, 118-20; *id.* pp. at 319-34.

neither affiliated with, nor endorsed by, nor operated by any government agency."[29]  Many consumers reported that they were deceived anyway.[30]

Instead of using consumers' private data to assist them, On Point sold it to third parties.[31]  After visiting the websites, consumers were bombarded with spam emails and text messages hawking psychic counseling, sweepstakes, and government grants.[32]  On Point made $17 million from these sites in 2019 alone.[33]

## C.    The FTC's Statutory And Contempt Actions

In 2019, the FTC sued Katz, Levison, and others, alleging that they violated Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), by falsely promising to provide licensing and motor-vehicle services, and determine eligibility for public benefits. OP-DE.1.  After a two-day evidentiary hearing, the district court entered a preliminary injunction against all defendants, terminating the deception.  OP-DE.126.  After some co-defendants appealed, this Court affirmed the injunction, holding that the district court "had ample evidence to conclude" that the websites were misleading.  *FTC v. On Point Capital Partners LLC*, 17 F.4th 1066, 1079-80

---

[29] OP-DE.440-1 at 288.

[30] OP-DE.440-1¶¶217-24; OP-DE.440-48 at 237-44.

[31] OP-DE.108 at 22-24; OP-DE.440-6¶10; OP-DE.437-3 at 58.

[32] OP-DE.440-1¶¶77, 122-23, 218-21; *id.* at pp. 336-37; OP-DE.440-2 at 153-54, 156-57.

[33] OP-DE.108 at 22-24.

(11th Cir. 2021). While that appeal was pending, the Supreme Court held in *AMG Capital Management, LLC v. FTC*, 141 S. Ct. 1341, 1344 (2021), that monetary relief is not available under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b). In light of *AMG*, this Court vacated the district court's entry of an asset freeze and receivership under Section 13(b). *On Point*, 17 F.4th at 1078.

Based on the deceptive On Point websites, the FTC also moved in early 2020 to hold Katz and 12 corporate entities in contempt of the 2014 *Acquinity* injunction against material misrepresentations. AQ-DE.135. Following discovery, the FTC filed a second contempt motion against Levison and two others. AQ-DE.137. After *AMG*, the district court entered a new preliminary injunction on the FTC's motion, and—pursuant to its inherent contempt power to police compliance with its own orders—froze the alleged contemnors' assets, and imposed a receivership to ensure relief was available for victims. AQ-DE.138; AQ-DE.174; AQ-DE.177.

The receiver removed On Point's paid-guide websites after concluding they could not be run lawfully, OP-DE.108 at 21, but received court permission to operate modified versions of the benefit-eligibility sites over the FTC's objection, OP-DE.234.

**D.    Summary Judgment Rulings**

In September 2021, the district court granted summary judgment, finding no genuine factual dispute that (1) Katz, Levison, On Point, and companies associated with them committed deceptive practices in violation of the FTC Act (OP-DE.528), and (2) those acts also placed them in contempt of the *Acquinity* injunction (AQ-DE.225).

*FTC Act Liability.*  The district court held that On Point's paid-guide sites "could lead a reasonably prudent consumer to believe that they were going to renew their license or car registration."  OP-DE.528 at 13.  On Point's "choice of centering, bold type, and white background made the deceptive text [such as 'Renew Driver's License'] jump out at a consumer," while the disclaimers were "difficult to read," "confusing at best," and failed to disclose "that the websites would *not* complete licensing or registration transactions."  *Id.* at 15-16.  Likewise, the public-benefit sites expressly invited consumers to "find out" if they qualified for benefits but never "inform[ed] consumers that the sites would not provide eligibility determinations."  *Id.* at 16.

The court held Katz and Levison personally liable because they had "authority to control" the deceptive scheme, having overseen business strategy and website content.  *Id.* at 19-21.  They knew about the high chargebacks, search-engine suspensions, and complaints from customers and employees.  *Id.*  Indeed,

Levison himself directed On Point employees to engage in load balancing to deflate chargeback rates. *Id.* at 20. After finding these violations "egregious in scope" and likely to recur, the court permanently enjoined Katz, Levison, and certain companies associated with them from committing similar misrepresentations and misusing customer information. *Id.* at 25-32.

*Summary Contempt.* The court likewise held Katz, Levison, and 12 entities in contempt of the *Acquinity* injunction. AQ-DE.225. The court found no genuine dispute that (1) On Point's websites contained material misrepresentations in violation of the injunction; (2) Katz controlled the violations; and (3) Levison had actual notice of the injunction and assisted Katz in carrying out the violations. *Id.* at 3-6. The court rejected Katz and Levison's defense that they had made "all reasonable efforts" to comply with the injunction, noting that they "continued to perpetuate the deceptive scheme" and that their purported "reliance on the advice of counsel is not a defense to contempt." *Id.* at 9-10.

E.   **Post-Trial Rulings And Remedy Administration**

In November 2021, after a bench trial, the district court found that Katz, Levison, and the corporate contempt defendants were "jointly and severally liable for an amount not to exceed $102,769,235.47," with the final amount to be determined through an opt-in claims process in which each claimant would be "wholly compensated." OP-DE.579 at 44-45.

17

In February 2022, the court approved the receiver's proposed claims process and distribution plan and authorized her to "immediately" hire a third-party administrator and pay consumers "without further Court order." OP-DE.607 at 2-3. Katz and Levison did not appeal—which the doctrine of practical finality would have permitted[34]—or seek a stay.

To the contrary, Katz and Levison urged the district court to *approve* the distribution plan, conceding it was "well within the Court's equitable power" to "redress consumer loss by allowing any consumers who believe they were deceived by Defendants' websites to request and receive reimbursement." OP-DE.602 at 2. Katz and Levison asked the court to overrule the FTC's objections to the opt-in aspect of the plan and "put money in the pockets of consumers sooner." *Id.* at 4-5. When the FTC later moved for reconsideration (because consumers were not receiving claims notices or were confusing them for spam), Katz and Levison opposed, stressing the need to compensate victims without "delay." OP-DE.624 at 4. Katz and Levison declared that the claims process "aligns with the evidence," *id.* at 5, and was the "appropriate contempt remedy," *id.* at 7. The court

---

[34] A defendant may appeal an order that "directs the defendant to pay a certain sum of money to the complainant," where the order is immediately executable and would impose irreparable harm. *Acheron Capital, Ltd. v. Mukamal*, 22 F.4th 979, 991-92 (11th Cir. 2022) (cleaned up).

largely denied the FTC's motion (while directing additional notices by mail) and

the claims process continued.  OP-DE.630.

In March 2023, the receiver notified the district court that she had completed

the claims process, that she was nearly done making distributions to the victims,

and that defendants' total liability was $19,599,235.68.  OP-DE.665.[35]  The

receiver reported that she still needed to make follow-up attempts for certain

unclaimed payments, *id.* at 1-4, but explained that she had collected more than $30

million from the corporate defendants—meaning she would not need to reach Katz

or Levison's personal assets to satisfy the $19.6 million judgment.  OP-DE.662 at

7; *see also* OP-DE.596 at 8.

In response to the receiver's notice, the district court issued an order

confirming the liability amount.  OP-DE.666.  Katz and Levison then appealed the

2021 orders imposing FTC Act and contempt liability, along with the sanctions

award.

### STANDARD OF REVIEW

The Court reviews summary judgment orders *de novo*, *Flournoy v. CML-GA*

*WB, LLC*, 851 F.3d 1335, 1337 (11th Cir. 2017), determining whether the movant

has "show[n] that there is no genuine dispute as to any material fact," Fed. R. Civ.

---

[35] The amount included $1,792,487 in refunds already paid and $8,739,193.09 in
additional allowed victim claims; the rest was administrative costs.  OP-DE.665 at
2-3.

P. 56(a). A "dispute is genuine if a reasonable trier of fact could return judgment for the non-moving party," and a "fact is material if it would affect the outcome of the suit." *Flournoy*, 851 F.3d at 1337 (cleaned up).

The Court reviews for abuse of discretion a district court's civil-contempt determination and choice of sanctions. *FTC v. Leshin*, 618 F.3d 1221, 1231-32 (11th Cir. 2010). An evidentiary hearing on civil contempt is not required "when there are no disputed factual matters." *In re Roth*, 935 F.3d 1270, 1278 (11th Cir. 2019) (quotation omitted). A decision whether to hold an evidentiary hearing regarding civil contempt is reviewed for abuse of discretion. *Thomas v. Tenneco Packaging Co.*, 293 F.3d 1306, 1319, 1326 (11th Cir. 2002).

## SUMMARY OF ARGUMENT

Katz and Levison argue that the district court erred by holding them liable for deceptive conduct under the FTC Act and awarding compensatory sanctions for civil contempt. But in the proceedings below, Katz and Levison urged the district court to *approve* the sanctions over the FTC's objections to the opt-in nature of the claims process, and to distribute compensation to consumers expeditiously. Now that this has happened, their appeal from the contempt rulings is waived, moot, and fails for lack of Article III standing. On the merits of both the contempt and FTC Act rulings, Katz and Levison fail to identify any legal error or abuse of discretion, or a genuine factual dispute that would have required a trial.

1.  At summary judgment, the district court correctly held the On Point websites materially misleading.  The websites made undisputedly false promises to perform government services, and the evidence confirms consumers were deceived.

On Point's websites prominently claimed to offer government services, such as driver's license renewals, but—after taking consumers' money—it provided no such services.  On Point also tricked consumers into revealing sensitive information, like cancer diagnoses, to find out if they were eligible for public benefits; On Point rendered no such assistance, however, and sold the personal information to scammers.  On Point's disclaimers—often buried in small gray text against a gray background—never disclosed that On Point did not offer the promised services.

Katz, Levison, and On Point knew that their websites were deceiving consumers.  They regularly discussed the company's high chargeback rates and search-engine suspensions for misleading content.  Katz received complaints from subordinates about the deception, and consumer complaints were so pervasive that the company ordered employees to write fake customer reviews to crowd out authentic reviews from scam victims.

2.  Katz and Levison's challenges to the contempt rulings are waived and also fail for lack of Article III jurisdiction.  Moreover, those challenges would fail on the merits in any event.

a.  Far from preserving objections to raise on appeal, Katz and Levison *invited* the district court to execute the contempt sanctions they now challenge, declaring that the remedy was supported by evidence and an appropriate use of the court's power.  They likewise stressed the urgency of compensating victims without delay.  Now that compensation has been distributed, Katz and Levison argue that no sanctions were appropriate.  The doctrines of waiver and invited error preclude this about-face.

Katz and Levison's contempt appeal is also moot.  No action by this Court can undo the payment of compensatory sanctions to the victims.  Moreover, Katz and Levison's liability is $0, because the joint-and-several judgment was paid by corporate co-defendants who have not appealed.  The payment mooted both the appeal from the remedy and the underlying contempt adjudication.  For similar reasons, Katz and Levison have no appellate standing.  They have not suffered a concrete injury that this Court can redress.

b.  Katz and Levison fail to show any error in the district court's decision to hold them in contempt for violating the 2014 injunction.

22

Levison was bound by the injunction under Rule 65(d), since he had actual notice of the order and acted in concert with Katz, a named party. Levison admitted under oath that he saw the order and discussed it with Katz shortly after it was entered; he then, as General Counsel of Katz's companies, went on to engage in activities that violated the injunction.

Katz and Levison may not collaterally attack the 2014 injunction as invalid. The challenge comes far too late, and it is meritless. If Katz and Levison had concerns about the injunction's terms, they should have raised those with the district court years ago. Instead, Katz consented to the injunction, which in any event was sufficiently precise in barring specific forms of material misrepresentation.

The district court correctly rejected Katz and Levison's assertion that they made all reasonable efforts to comply with the injunction. Reasonable efforts would have involved telling the truth, making clear and prominent disclosures, and not trying to suppress evidence of deception; Katz and Levison did none of this. They claim to have relied on advice of counsel, but they admit this is not a defense to civil contempt.

c. Katz and Levison fail to show that the district court abused its discretion when awarding compensatory sanctions. They assert that the district court was powerless to order sanctions for violations of an injunction imposed under the FTC

23

Act, but this Court recently rejected that very argument, confirming that courts have "extremely broad and flexible" powers to award compensatory relief. *FTC v. Nat'l Urological Grp., Inc.*, 80 F.4th 1236, 1242-43 (11th Cir. 2023). The remedy here—a joint-and-several restitution award measured by each victim's loss—was plainly compensatory in nature, as Katz and Levison conceded below.

3. Katz and Levison's suggestion of judicial bias has no basis in law or fact.

## ARGUMENT

**I.   THE DISTRICT COURT CORRECTLY HELD THAT KATZ AND LEVISON'S WEBSITES WERE DECEPTIVE**

Section 5 of the FTC Act prohibits (1) representations that are (2) likely to mislead consumers acting reasonably under the circumstances and (3) material to a consumer's decision to act. *FTC v. On Point Capital Partners LLC*, 17 F.4th 1066, 1079 (11th Cir. 2021). In prior proceedings affirming the district court's entry of a preliminary injunction, this Court concluded that the On Point websites in question "could easily be perceived by unwary visitors as promising government services or benefits," and that the sites' disclaimers were not "sufficient to disabuse consumers of this impression, being either too small or too vague to dispel the misrepresentations." *Id.* at 1080. Moreover, those misrepresentations were "clearly material." *See id.* The unrebutted summary-judgment record confirms these conclusions. And because Katz and Levison no longer dispute that they

24

controlled and were aware of the misrepresentations, the district court's ruling that they were personally liable for violating the FTC Act should be affirmed.

### A.    The Websites Deceptively Promoted Government Services And Eligibility Determinations

Although Katz and Levison argue (Br.55-65) there were triable issues of fact that precluded the district court from determining deception at summary judgment, they do not "dispute the content" (Br.23) of their websites.  And those sites explicitly (and in bold type) announced that consumers could "**Renew Drivers License[s] in Your State**," OP-DE.440-1 at 207, or "**Find Out if You Are Eligible For**" government benefits, OP-DE.440-1 at 288, while providing consumers only with generic PDF documents.

When the FTC charges that an advertisement conveys a misleading claim, a court must assess whether the "net impression" of the statements would likely lead at least a "significant minority of reasonable consumers" to take away that claim. *Fanning v. FTC*, 821 F.3d 164, 170-71 (1st Cir. 2016) (cleaned up).  Misleading claims may be express or implied.  *Kraft, Inc. v. FTC*, 970 F.2d 311, 318-22 (7th Cir. 1992).  Revealing the truth in disclaimers that consumers are unlikely to notice, read, or understand is insufficient.  *FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 42-43 (D.C. Cir. 1985).  "*Caveat emptor* is not the law in this circuit." *FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228, 1233 (11th Cir. 2014).

Here, any reasonable factfinder would conclude that the websites promised government benefits, the disclaimers were insufficient, and consumers were likely to be misled. The court therefore could have readily granted summary judgment based on the websites' plain text alone. But the FTC also provided extrinsic evidence confirming actual deception of consumers and On Point, Katz, and Levison's awareness of it. Katz and Levison counter that evidence only with unsubstantiated assertions and irrelevant defenses that cannot defeat summary judgment.

### 1.    The Websites Were Misleading On Their Face

Katz and Levison appear not to dispute that on summary judgment, courts may determine the "net impression of representations" based on the terms of a deceptive solicitation alone. *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 631-32 (6th Cir. 2014). *See FTC v. Cyberspace.Com, LLC*, 453 F.3d 1196, 1200-01 (9th Cir. 2006) (affirming summary judgment based primarily on face of deceptive solicitations); *FTC v. USA Financial, LLC*, 415 F. App'x 970, 973 (11th Cir. 2011) (same). Here, the district court found no genuine dispute that the "net impression" of the websites promised government services and that the sites were "likely to

mislead consumers." OP-DE.528 at 16.[36]  Katz and Levison fail to identify any

disputable questions for trial.

     ***The Licensing Sites.***  On "official-sounding website[s] like 'DMV.com,'"

*On Point*, 17 F.4th at 1080, On Point unambiguously promised to render licensing

services.  The sites claimed to be a "comprehensive resource for all you[r] driver

license-related services"; featured a headline encouraging visitors to "**Renew**

**Drivers License In Your State**"; and urged consumers in orange capital letters to

"COMPLETE THE PROCESS NOW."  OP-DE.440-1 at 207, 219, 266.  The sites

instructed consumers to "Select a Service," with checkboxes for "Renew Driver's

License" and "Replace Driver's License."  *Id.* at 121-32, OP-DE.440-64 at 5-43,

OP-DE.440-65 at 1-71.  As the district court observed, "a reasonably prudent

consumer in this context would understand 'renew driver's license' to mean 'you

can renew your driver's license here.'  Indeed, On Point purchased search-engine

advertising that would direct consumers searching for that service to their

websites."  OP-DE.528 at 15.

---

[36] The district court was not required to hold an oral hearing before granting
summary judgment.  *See Erco Indus., Ltd. v. Seabord Coast Line R.R. Co.*, 644
F.2d 424, 431 (5th Cir. May 1981).  Fifth Circuit decisions before October 1, 1981
are binding in this Circuit.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th
Cir. 1981) (en banc).

Katz and Levison argue that the search-engine ads dispelled any misimpression from the sites themselves, *see* Br.18-19, 56, but the law permits no such defense. "[E]ach advertisement must stand on its own merits[,] even if other advertisements contain accurate, non-deceptive claims." *E.M.A. Nationwide*, 767 F.3d at 632 (cleaned up). In any case, On Point's search-engine ads only reinforced the deceptive message with prominent, bold links to "Get Your License" and "Renew … License," and obscure references to "guides" in much smaller text.



AQ-DE.178-1 at 340. On Point's Facebook ads explicitly told consumers, "you can renew you[r] driver licenses online here!! Skip the lines doing it from you[r] home." OP-DE.440-2 at 303-04. No trial was needed to find those representations misleading.

Katz and Levison similarly misplace their reliance on their websites' fine-print disclosures. Br.56-59. The district court held those were "confusing at best" and failed to reveal "that the websites would not complete licensing or registration transactions." OP-DE.528 at 16. Disclaimers can remediate otherwise-false representations only when "sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression." *FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 12 (1st Cir. 2010) (quotation omitted) (affirming summary judgment). Katz and Levison cite several purported disclosures from their websites, but none of them clearly and conspicuously informed consumers that government services were unavailable.

*First*, although the sites offered consumers a "road guide" (Br.58), they also claimed to be a "comprehensive resource" for "all … driver license-related services" and directed consumers to "SELECT A SERVICE," such as "Renew Driver's License." OP-DE.440-1 at 121, 207-08. The sites' representation that consumers "can purchase" guides, *id.*, did not dispel the impression that services were also available.

*Second*, certain sites may have "disclaimed government affiliation" (Br.57), but those disclaimers were not sufficiently prominent to leave an accurate impression. The statement that the sites were "in no way or fashion affiliated with any federal or local governmental agency or offices" appeared in tiny gray letters,

set against a gray background at the top of each webpage. *E.g.*, OP-DE.440-1 at 207. And the very webpage that Katz and Levison cite for this disclaimer included prominent links to "Renew Your Driver's License," and offered consumers "personalized information" and "document preparation." OP-DE.440-1 at 134.

*Third,* the "IMPORTANT NOTICE" terms-and-conditions page pointed to by Katz and Levison (Br.24-25, 57-58) suggested that license-renewal services were available by offering consumers "an automated software solution … to complete the form(s) on our Site." OP-DE.440-1 at 209. Katz and Levison have not shown otherwise in describing the page's three paragraphs of small-print legalese in which the consumer "agree[s] to comply with all applicable laws and regulations," agrees that On Point is "not a law firm," and agrees to "waiv[e] the right to a trial by jury." *Id.*[37]

*Fourth*, contrary to Katz and Levison's assertions (Br.24), no meaningful disclaimer was provided by the following pop-up window, which sometimes appeared on the websites:

---

[37] Katz and Levison falsely assert that "the judge acknowledged at trial" that these disclaimers were innocuous. Br.25. The district court was actually addressing the websites *modified* by the receiver to remove deceptive content. OP-DE.595 at 118.



OP-DE.440-1 at p. 277; s*ee also id.* ¶¶29, 43, 58.  Among the boldfaced cautions about the hazards of driving with an expired license, the offer of "live support for a fee," and the assurance "that the process is handled in a compliant and timely manner," the pop-up never states that consumers will receive *only* a guide, not a motor-vehicle transaction.

Finally, as the district court observed, On Point's disclosures were buried in "smaller text" than the deceptive claims and were "difficult to read."  OP-DE.528 at 15.  "[I]nconspicuous" disclaimers like this are ineffective because consumers are unlikely to "pay attention" to them.  *Brown & Williamson*, 778 F.2d at 42-43.

***The Government Benefit Sites***.  On Point's benefit-eligibility sites were even more explicit in promising government services.  In a bold headline, the sites urged consumers to provide personal information to "**Find Out if You Are Eligible For the Section 8 Program**," OP-DE.440-1 at 288, the "**Medicaid**

31

**Program**," *id.* at 197, the "**Food Stamps Program**," OP-DE.440-2 at 107, and so on. The sites then directed consumers to "**Confirm Your Eligibility**" by providing sensitive personal information, such as household income, debt information, and medical diagnoses. *Id.* at 108-24. Katz and Levison assert that the benefit-eligibility cites mentioned "guides" and disclaimed government affiliation in small print. Br.26-27, 58-59. But, as the district court concluded, the disclaimers were "hardly prominent or sufficient," OP-DE.528 at 17, and did not clearly dispel the impression that the sites would "provide eligibility determinations" in addition to guides. *Id.* at 16.

## 2.    Undisputed Evidence Confirms That Consumers Were Misled

When considering whether a representation is likely to mislead, proof of "actual deception" is "highly probative." *Cyberspace.Com*, 453 F.3d at 1201. Here, unrebutted evidence shows that the On Point websites "were not just likely to mislead consumers, but actively [did] so." *On Point*, 17 F.4th at 1080. And while the FTC Act does not require proof of deceptive intent, *Orkin Exterminating Co. v. FTC,* 849 F.2d 1354, 1368 (11th Cir. 1988), On Point, Katz, and Levison undeniably knew for years that their websites were scamming consumers.

For one thing, Katz and his staff fielded complaints from On Point employees who were remorseful about misleading consumers. One employee lamented that On Point did not "add[] value to the users. Guides are sometimes

32

confusing for the people and that causes problems for us such as suspensions from our main platforms Google & Bing."  OP-DE.440-23 at 30-31; *see also* OP-DE.440-44 at 79-89.  Another employee complained that "some of the money we earn comes from a service that has, at least in the past, tried to misrepresent itself as something other than a how-to guide."  OP-DE.440-23 at 31.  In a "Fraud Reduction Plan," On Point acknowledged that its disclaimers did not resolve "confusion from customers."  OP-DE.440-14 at 20.

On Point was also well-aware of frequent consumer complaints and credit-card chargebacks; these triggered Visa's fraud-monitoring thresholds 64 times in three years, OP-DE.440-7¶18, which by itself constitutes "mounting evidence of fraud."  *FTC v. WV Universal Mgmt., LLC*, 877 F.3d 1234, 1237 (11th Cir. 2017).  On Point tried to conceal this evidence by creating new front companies with different accounts, artificially deflating chargeback ratios, and writing fake reviews.  *See supra* pp. 10-11.  On Point staff, including Katz and Levison, regularly discussed On Point's "very high" chargeback rates and search-engine suspensions.[38]

---

[38] OP-DE.440-26 at 57, 70, 83, 87; OP-DE.440-42 at 56-57; OP-DE.440-47 at 205; OP-DE.440-44 at 44-45, 85-86, 89-90; OP-DE.440-40 at 184-88; OP-DE.440-46 at 65-69.

Katz and Levison dispute none of these facts. Instead, they respond with irrelevant and unsupported assertions. They assert that "on a global scale, chargebacks were typically less than 1.5%," Br.62, even though rates above 1% exceed Visa's fraud-monitoring thresholds. OP-DE.440-9¶10. Katz and Levison also reference a comment by the receiver that "evidence of chargebacks on OPG's websites were not high relative to the market." AQ-DE.200-24¶20. But the receiver did not explain how she reached that conclusion or how she was defining "the market" or "high." *See Leigh v. Warner Bros, Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000) ("[C]onclusory assertions without specific supporting facts have no probative value.") (cleaned up). Moreover, the receiver's cursory remark does not refute evidence that On Point *itself* considered the chargeback rates very high, and that the chargeback rates were so high that several payment processors terminated On Point's accounts. *See supra* pp. 9-10, 33.[39]

Katz and Levison next assert that the roughly 1,000 consumers who complained to the government about the deceptive websites represented a "low" number of dissatisfied consumers compared to the number of transactions. Br.62. However, unrebutted evidence showed that On Point itself received thousands of

---

[39] Katz and Levison assert that "no credit card association (such as Visa or Mastercard)" closed an On Point merchant account, Br.27, ignoring that On Point's *credit-card processors* regularly closed such accounts.

calls and emails from customers every day, AQ-DE.178-67 at 22, 31, 34, 43, 46, 67; Katz and Levison received reports showing that these inquiries most frequently came from unsatisfied customers seeking refunds, AQ-DE.178-26 at 8, 42-44. Indeed, the company prepared extensive scripts for responding to customers who were under the mistaken belief that they were going to receive government services.  AQ-DE.178-67 at 8-19, 720-21, 726-27, 736, 755-56.[40]

Finally, Katz and Levison claim that On Point launched a fake-review-writing campaign "for reasons unconnected to deception."  Br.63-64.  As the record shows, however, the company expressly acknowledged that the purpose of the fake reviews was to "push negative reviews off of the first page in google search listings," by posing as an "objective third party" happy with the "PAID GUIDE" they received.  OP-DE.440-40 at 29.  Katz and Levison cite no evidence suggesting any objective other than to mislead, and their "unsupported factual allegations are legally insufficient to defeat a summary judgment motion."  *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005).

---

[40] The FTC presented expert consumer-perception surveys showing that most participants believed the On Point sites would provide government services or determine eligibility for benefits.  OP-DE.440-5¶¶88-89, 102-03, 106-07.  However, because "consumer survey evidence is not required" to determine "likely public reaction," *Brown & Williamson*, 778 F.2d at 40-42, Katz and Levison miss the mark in attacking the surveys (Br.29-30, 63), as the district court held.  OP-DE.528 at 13-14.

### 3.    Katz and Levison's Defenses Are Immaterial And Meritless

Katz and Levison offer various defenses that are not cognizable under the FTC Act and cannot present a triable issue of fact.

**Satisfied customers.**  A defendant cannot defeat liability by pointing to some "satisfied customers." *FTC v. Tashman*, 318 F.3d 1273, 1277-78 (11th Cir. 2003); *accord FTC v. Freecom Communications, Inc.*, 401 F.3d 1192, 1206 n.8 (10th Cir. 2005).  Thus, it is immaterial that the district court, when considering remedies, found "anecdotal evidence" that some consumers were satisfied with their purchases.  Br.54, 59 (quoting OP-DE.579 at 20).  Under the FTC Act, the question is whether "at least a *significant minority* of reasonable consumers would *likely* interpret the ad to assert" the deceptive claim. *POM Wonderful, LLC v. FTC*, 777 F3d 478, 490 (D.C. Cir. 2015) (cleaned up, emphasis added).  The Commission need not prove that all, or even most, consumers were actually misled.  *Id.*

For similar reasons, Katz and Levison's claim that the sites had "[r]epeat customers" is not a defense.  Br.28, 63 (citing OP-DE.127-2¶8).  *See FTC v. AMG Cap. Mgmt., LLC*, 910 F.3d 417, 428 (9th Cir. 2018) (evidence of "repeat borrowers" insufficient to defeat summary judgment), *rev'd on other grounds*, 141 S. Ct. 1341 (2021).  In any event, the cited evidence shows that the sites had repeat *visitors*, not repeat transactions.  As the district court explained, On Point sent

36

consumers "a barrage of text messages and emails linking back" to its websites, "perpetuat[ing] the very deception that tricked consumers in the first place." OP-DE.579 at 42. On Point's return-visitor statistics included "[a]ny consumer who clicked on any such message" and were not evidence of customer satisfaction. *Id.*

**Refunds.** It is irrelevant that some consumers may have received refunds after complaining. Br.29. The "existence of a money-back guarantee" is an "insufficient" defense "as a matter of law." *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1103 (9th Cir. 1994).

**Advice of Counsel.** On Point's purported reliance on advice of counsel (Br.30-32) "is irrelevant to an action brought pursuant to section 5" of the FTC Act, since "a practice may be deceptive without a showing of intent to deceive." *Orkin*, 849 F.2d at 1368; *accord Cyberspace.Com*, 453 F.3d at 1202.

**Reliance on Prior FTC Consent Order.** Katz and Levison failed to preserve below their claim that they modeled On Point's conduct on a consent order in a different case. *See* Br.59-62; OP-DE.472. Because they have not offered any justification for their failure to raise the claim in district court, this Court should not entertain it. *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331-32 (11th Cir. 2004).

In any event, the On Point websites come nowhere close to satisfying the terms of the consent order that Katz and Levison seek to rely upon. *See FTC v.*

*DOTAuthority.com, Inc.*, No. 0:16-cv-62186-WJZ, Dkt. No. 230-1 (S.D. Fla. Mar. 16, 2018).  The order requires that disclosures be "Clear and Conspicuous," meaning they must (1) be "difficult to miss (i.e., easily noticeable)" and "easily understandable by ordinary Persons"; (2) "stand out from any accompanying text or other visual elements"; (3) "be unavoidable"; (4) "use diction and syntax understandable to ordinary Persons"; and (5) "not be contradicted or mitigated by, or inconsistent with, anything else in the communication."  *Id.* at 2-3.  Even if that order governed here—and it does not—the websites flunk all these requirements.

> **Receiver's Revenues.**  Katz and Levison cannot avoid liability by pointing to the receiver's ability to continue generating revenue "after taking helm of the business and adopting court-approved templates to supposedly eliminate confusion."  Br.64; *see also* Br.55.  The receiver's business operations do nothing to refute the evidence that Katz and Levison's versions of the websites contained deceptive representations.  Indeed, Katz and Levison fail to disclose that "[t]he Receiver discontinued the Paid-Guide Sites" *entirely* after concluding they could not be run lawfully.  OP-DE.169 at 2 n.1; *see also* OP-DE 108 at 21.

### B.    The Misrepresentations Were Material

On Point's promises to provide government services and determine eligibility for benefits were not only false, but material.  "A claim is considered material if it involves information that is important to consumers and, hence, likely

38

to affect their choice of, or conduct regarding a product." *Fanning*, 821 F.3d at 182 (cleaned up). On appeal, Katz and Levison dispute "that consumers actually cared about government affiliation when interacting with [On Point's] websites," claiming that consumers "just want[ed] the guide or service offered."[41] Br.64. But they abandoned this challenge to materiality by failing to raise it below. *See* OP-DE.471 at 6-11; *Access Now*, 385 F.3d at 1331-32.

In any event, On Point's misrepresentations were "clearly material," *On Point*, 17 F.4th at 1080, because license renewals and eligibility determinations were a central characteristic of the advertised products, and On Point promoted those services expressly and intentionally. *See Fanning*, 821 F.3d at 182 (express claims and claims regarding a "central characteristic" of a product are presumptively material). Several consumer declarants attested that they transacted business with the websites precisely because they expected the sites to provide government services. OP-DE.440-18 at 1-39.

\*        \*        \*

On Point thus committed material misrepresentations in violation of Section 5(a) of the FTC Act. Katz and Levison do not challenge the district court's ruling

---

[41] This assertion appears to concede that the websites sites made material promises to provide "services" in addition to guides. *See supra* pp. 24-38.

that they are personally liable for these violations because they had "authority to control" and sufficient knowledge of the corporate misconduct. OP-DE.528 at 18-21. Nor do they challenge the terms of the permanent injunction that the court imposed below to remedy these violations. *Id.* at 28-36. Accordingly, the district court did not err in entering judgment against Katz and Levison for violating the FTC Act.

## II. KATZ AND LEVISON'S APPEAL FROM THE CONTEMPT RULINGS IS WAIVED, FAILS FOR LACK OF ARTICLE III JURISDICTION, AND IS BASELESS ON THE MERITS

Katz and Levison also appeal the district court's determination of contempt liability and the court's award of sanctions for their violation of the 2014 *Acquinity* injunction. Br.43-54, 65-72. But they waived any such appeal by telling the district court that the sanctions were proper and supported by evidence, and urging the court to let the receiver distribute the funds immediately through a victim-claims process. Now that the claims process is complete and all claimants will be paid using corporate funds, no live case or controversy remains. The contempt matter is moot, and Katz and Levison lack constitutional standing to appeal the contempt-related rulings of the district court.

Regardless, Katz and Levison's arguments on appeal have no merit. They contest the district court's rulings that (1) Levison had knowledge of the 2014 *Acquinity* injunction; (2) the injunction was valid and lawful; (3) Katz and Levison

40

had the ability to comply; and (4) they were jointly and severally liable for monetary sanctions. As shown below, the district court's rulings were faithful to precedent and the undisputed record.

### A. Katz And Levison Waived And Mooted Their Appeal By Persuading The District Court To Execute The Remedy

1. Katz and Levison waived any challenge to the contempt sanctions by telling the district court that it was "well within the Court's equitable power" to "redress consumer loss" and urging the court to let the receiver execute the district court's remedy forthwith, to "accelerate the process of consumer redress." OP-DE.602 at 2, 4-5. When the FTC later moved for reconsideration of the orders requiring an opt-in claims process, Katz and Levison again declared that the claims process "aligns with the evidence," OP-DE.624 at 5; was the "appropriate contempt remedy," *id.* at 7; and should be executed without "delay," *id.* at 4. The district court sided with Katz and Levison. OP-DE.607 & 630. At no point did Katz and Levison signal that they intended to appeal the remedy they had affirmatively endorsed.

Katz and Levison have now flipped positions, arguing that any sanctions were invalid. Br.43-54, 65-72. But since Katz and Levison invited the district court to implement the sanctions remedy, their challenge to that remedy is "*waived* through the doctrine of invited error." *United States v. Brannan*, 562 F.3d 1300, 1306 (11th Cir. 2009). "It is a cardinal rule of appellate review that a party may

41

not challenge as error a ruling or other trial proceeding invited by that party."
*Ford ex rel. Estate of Ford v. Garcia*, 289 F.3d 1283, 1293-94 (11th Cir. 2002)
(cleaned up).  Here, since Katz and Levison successfully induced the district court
to execute the sanctions remedy, this "Court is precluded from reviewing" any
claimed errors associated with that remedy.  *Brannan*, 562 F.3d at 1306 (cleaned
up).

2.  In addition, Katz and Levison's appeal from the contempt sanctions is
now moot since (1) the victim-claims process is complete, (2) most claimants have
already been paid (with follow-up attempts underway for any unclaimed
payments), and (3) the receiver has obtained more than enough funds from the
corporate defendants ($30 million) to cover the entire $19.6 million joint-and-
several judgment without touching Katz or Levison's personal assets.  *See supra* p.
19 (discussing OP-DE.665, OP-DE.666, OP-DE.662 at 7).  Katz and Levison have
no personal stake in appealing the contempt rulings since their obligation is $0 and
unwinding the remedy would be impossible.

A defendant's appeal from a joint-and-several restitution award becomes
moot when, as here, "codefendant[s]" who are not before the appeals court "paid
the restitution bill in full."  *United States v. Balint*, 201 F.3d 928, 936 (7th Cir.
2000).  This Court "cannot relieve" Katz and Levison "of an obligation that
already has been extinguished by another party."  *Id.*  Even if the corporate

42

defendants could hypothetically seek to recoup the money from Katz and Levison, their "vulnerability to a future civil suit for contribution by a third party not before [the Court] does not preserve *this* appeal." *Id.* at 937 n.2. *Accord Jennifer Matthew Nursing & Rehab. Ctr. v. HHS*, 607 F.3d 951, 957 (2d Cir. 2010).

Moreover, once the sanctions were paid, this mooted Katz and Levison's appeal not only from the monetary award, but also from the contempt adjudication itself. When a court exercises its "inherent authority" to impose sanctions and the litigant pays the sanction "in full," this "renders moot any appeal of the sanction." *RES-GA Cobblestone, LLC v. Blake Construction & Development, LLC*, 718 F.3d 1308, 1314-15 (11th Cir. 2013). Allowing defendants to challenge the underlying contempt findings "when the [sanctions] amount has already been paid would violate the constitutional prohibition against this Court deciding abstract, hypothetical, or contingent questions." *CFTC v. Escobio*, 946 F.3d 1242, 1250 (11th Cir. 2020) (cleaned up).

This appeal is also moot because no action by this Court could undo the receiver's distribution of assets to Katz and Levison's victims. Once the receiver implemented her distribution plan, the order became "effectively unreviewable on appeal" because the assets are now "unrecoverable." *SEC v. Torchia*, 922 F.3d 1307, 1316 (11th Cir. 2019) (cleaned up). The claimants have been verified; redress payments have been deposited (and where necessary, reissued); and the

43

receiver and her third-party claims administrator have been compensated. OP-DE.665. This Court could only undo the contempt sanctions by cancelling the rights of innocent third parties against whom Katz and Levison have brought no claims for relief.

Precedent bars that unjust outcome. *See San Francisco Residence Club, Inc. v. 7027 Old Madison Pike, LLC*, 583 F.3d 750, 754 (11th Cir. 2009). "Where, as here, the only relief sought would cancel rights granted to a third party" by the order on appeal, "the appeal becomes moot because the court of appeals is powerless to grant such relief." *Id.* at 755 (quotation omitted). Accordingly, this Court will not hear an appeal that would "affect the rights of a third party who, pursuant to the order, acquired, in good faith, an interest in property." *Id.* at 754-55 (cleaned up).[42]

For the same reasons the contempt appeal is moot, Katz and Levison lack appellate standing. The district court's contempt judgment has caused them no concrete and particularized injury (since they owe nothing), much less an injury that can be redressed by a favorable ruling of this Court. *See, e.g.*, *Kimberly Regenesis, LLC v. Lee Cnty.*, 64 F.4th 1253, 1260 (11th Cir. 2023).

---

[42] To preserve their appeal, Katz and Levison would have needed seek a stay of the receiver's distribution plan. *See San Francisco Residence Club*, 583 F.3d at 754 (recognizing that "absent a stay, a party's appeal may become moot").

Even if Katz and Levison had presented a live Article III case or controversy, this Court would be within its equitable power to "dismiss" any appeal of compensatory sanctions that have "already been distributed to the defrauded [victims]," given the "considerable disruption" this would cause "innocent third parties."  *SEC v. Wozniak*, 33 F.3d 13, 15 (7th Cir. 1994); *accord SEC v. Capital Consultants, LLC*, 397 F.3d 733, 745-46 (9th Cir. 2005).

### B.    The District Court Correctly Held Katz And Levison In Contempt

Even if Katz and Levison could challenge the contempt rulings, their challenge would fail.  "A finding of civil contempt must be supported by clear and convincing evidence that the allegedly violated order was valid and lawful; the order was clear and unambiguous; and the alleged violator had the ability to comply with the order."  *FTC v. Leshin*, 618 F.3d 1221, 1232 (11th Cir. 2010) (*Leshin I*) (cleaned up).  The district court did not err when holding that (1) Levison was bound by the order even though he was not named in it; (2) the order was valid and lawful; and (3) both Katz and Levison had the ability to comply.

#### 1.    Levison Had Actual Notice Of The *Acquinity* Injunction

The district court correctly ruled that Levison can be held in contempt because there is no genuine dispute that he had actual notice of the *Acquinity*

injunction.  AQ-DE.225 at 5-6; *see also* AQ-DE.174 at 7-8.  Levison admitted under oath that he had seen the injunction and that Katz told him about it around the time it was entered.  *See supra* p. 5 (citing AQ-DE 178-46 at 100-03).  That is all the law requires.

Under Federal Rule of Civil Procedure 65(d), an order may bind persons who "receive actual notice of it by personal service or otherwise" when they are "in active concert or participation" with a named party.  The rule codifies the principle that "defendants may not nullify [an injunction] by carrying out prohibited acts through aiders and abettors" who "were not parties to the original proceeding."  *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945).  The rule ensures that "individuals responsible for the affairs of a corporation can be individually held in contempt for disobeying a known injunctive order."  *Leshin I*, 618 F.3d at 1236.

Under the plain language of Rule 65(d), a movant for contempt must show that a non-party to an injunction had actual notice of the injunction; knowledge of the injunction's specific terms is not required.  *See ADT LLC v. NorthStar Alarm Servs., LLC*, 853 F.3d 1348, 1354-55 (11th Cir. 2017) (observing that Rule 65(d) requires showing that contemnor "knew about *the injunction*") (emphasis added).  "Although several courts have found that contemnors had actual notice of the terms of the court order, they do not hold that such finding is necessary."  *United*

*States v. Baker*, 641 F.2d 1311, 1317 (9th Cir. 1981).  As the Ninth Circuit has held, "[k]nowledge of the order is enough."  *Id*.; *see also FTC v. Neiswonger,* 494 F. Supp. 2d 1067, 1079-80 (E.D. Mo. 2007) (Rule 65(d) showing met where contemnor learned of injunction's "existence" from long-term business partner, even though he "may never had seen" it), *aff'd*, 580 F.3d 769 (8th Cir. 2009); *Dystar Corp. v. Canto,* 1 F. Supp. 2d 48, 57 (D. Mass. 1997) (knowledge shown through executive's admission that he had "seen" order).[43]

These rulings recognize that it would be too easy to evade contempt sanctions by violating a known order while pleading ignorance of the order's details.  *See Neiswonger*, 494 F. Supp. 2d at 1079.  For example, a person cannot escape contempt by refusing service of an order to avoid learning what it says.  *Reliance Ins. Co. v. Mast Constr. Co.*, 159 F.3d 1311, 1318 (10th Cir. 1998).  Similarly, an attorney like Levison must comply with court orders and cannot accept his client's "interpretation" of an order when the attorney has "actual notice

---

[43] Levison's main authority is a magistrate judge's report and recommendation describing Rule 65(d) as requiring "actual notice of the enjoined acts."  Br.70, citing *Blanco GmbH + Co. v. Vlanco Indus.*, LLC, 992 F. Supp. 2d 1225, 1248 (S.D. Fla. 2014), *aff'd sub nom.*, *Blanco GmbH + Co. v. Laera*, 620 F. App'x 718 (11th Cir. 2015).  The magistrate judge did not cite any case law for this observation, which did not affect the outcome of the case.  Indeed, the district court order adopting the magistrate judge's report deemed it dispositive that the defendants "had actual notice of the *Consent Judgment*."  992 F. Supp. 2d at 1233 (emphasis added).

of the order itself." *See SEC v. Bilzerian*, 613 F. Supp. 2d 66, 73 (D.D.C. 2009) (imposing contempt judgment without evidentiary hearing), *aff'd*, 410 F. App'x 346 (D.C. Cir. 2010).

During his deposition, Levison admitted that Katz made him "very aware" of the "FTC/Acquinity matter" and settlement shortly after it was resolved. AQ-DE.178-46 at 100-01. When FTC counsel showed Levison a copy of the order captioned, "Stipulated Final Judgment And Order For Permanent Injunction And Other Equitable Relief As To Defendant[] Burton Katz," Levison admitted, "Yes, I have seen this order ... when it was resolved or when it got entered into." *Id.* at 101-03. Indeed, after the *Acquinity* order was entered, it was *Levison* who informed Katz's lawyers in that matter that Katz would not be paying their bills, because they achieved "zero results" for him. AQ-DE.178-34 at 6-7. Katz corroborated Levison's knowledge in a sworn compliance report where he stated that he and Levison had spoken about the order and had several email communications about it in 2014 and 2016. *Id.* at 2.[44]

Levison argues that the court was required to hold an evidentiary hearing regarding his knowledge of the order, Br.72, but he fails to identify any "disputed

---

[44] Levison calls it "undisputed" that he "was never provided with a copy of the injunction," Br.10, eliding his sworn admissions that he saw the injunction and was "very aware" of it, AQ-DE.178-46 at 100-03.

factual matters" that would require one.  *In re Roth*, 935 F.3d 1270, 1278 (11th Cir. 2019).[45]  Levison also says he assumed the injunction was "unconnected" to On Point "because it concerned mobile billing."  *See* Br.32.  But since Levison knew that Katz was under an order in an FTC consumer-protection case, Levison was not free to ignore the order—or make faulty assumptions about its requirements— when becoming Katz's business partner and General Counsel of his companies. The order forbade Levison from acting in concert with Katz to misrepresent the nature or characteristics of a product or service.  The district court ruled that the undisputed evidence showed that Levison *did* act in concert with Katz by playing an "essential role" in the deceptive scheme, *see* AQ-DE.225 at 5-6, and Levison does not appeal that determination.

## 2.     The Injunction Was Valid And Lawful

The district court correctly rejected Katz and Levison's collateral attack on the validity of the *Acquinity* injunction.  Br.65-68; *see* AQ-DE.174 at 4-6; AQ-DE.225 at 3.  For starters, because Katz "consented to the consent judgment, he

---

[45] Levison asserts that the district court held a hearing regarding a different defendant, Elisha Rothman, and found that Rothman lacked notice of the order. Br.72.  But there, the district court found that the undisputed facts showed only that Rothman and Katz discussed "the *Acquinity* litigation in general," not "the substance of the settlement order."  AQ-DE.225 at 7.  Rothman's knowledge of the order thus was a disputed fact warranting a hearing.  Here, Levison's own admissions demonstrated his knowledge, so no hearing was needed.

cannot now challenge its validity on appeal" from a later contempt ruling. *Blanco GmbH + Co. v. Vlanco Indus., LLC*, 642 F. App'x 934, 936 (11th Cir. 2016) (discussing *Reynolds v. Roberts*, 202 F.3d 1303, 1312 (11th Cir. 2000)); *accord FTC v. EDebitPay, LLC*, 695 F.3d 938, 944 (9th Cir. 2012) (same).

Katz and Levison's objections to the *Acquinity* order also come too late. They cannot "defeat [the] injunction by … (1) staying silent about purported ambiguities; (2) deliberately engaging in activities that risk violating the injunction; and (3) pleading ignorance after those risky activities are indeed found to violate the injunction." *FTC v. Nat'l Urological Grp., Inc.*, 786 F. App'x 947, 954-55 (11th Cir. 2019) (*Nat'l Urological I*) (discussing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192-93 (1949)). If Katz had misgivings about the injunction, he should not have agreed to be bound by it, and he could have later asked the district court to modify or clarify it. Likewise, Levison, as General Counsel, could have advised Katz or On Point to request clarification or modification—or he could have done so himself as a non-party potentially subject to the order. *See id.* at 955-56; *Regal Knitwear*, 324 U.S. at 15*; cf. Levine v. Comcoa Ltd.*, 70 F.3d 1191, 1194 (11th Cir. 1995) (lawyer's "disregard [of] the district court's order, based on his personal belief that it was invalid … warrants a determination of contempt").

50

In any event, Katz and Levison's challenges to the injunction are baseless.

The injunction bars Katz and those in "active concert or participation" with him

from

> in connection with the advertising, marketing, promotion, offering for
> sale, sale, or distribution of any product or service … making, or
> assisting others in making, expressly or by implication, any false or
> misleading material representation, including representations
> concerning the cost, performance, efficacy, nature, characteristics,
> benefits, or safety of any product or service, or concerning any
> consumer's obligation to pay for charges for any product of service.

AQ-DE.132 at 3.  The injunction comports with Rule 65(d) because it "state[s] its

terms specifically" and "describe[s] in reasonable detail … the act or acts

restrained or required."

Katz and Levison are incorrect in characterizing the *Acquinity* order as "a

paragon example of an 'obey-the-law' injunction." Br.66.  The injunction is more

detailed than the FTC Act's prohibition on "deceptive" acts or practices, in that it

forbids "false or misleading material representations" concerning specific

attributes of a product or service, including the product's "performance, efficacy,

nature, characteristics, [or] benefits." AQ-DE.132 at 3.  The violations in this case

involved material misrepresentation of all five product attributes.  Katz and

Levison fail to acknowledge these requirements of the injunction (using ellipses to

omit them from their brief, Br.66), much less argue that they violate Rule 65(d).

Because the 2014 injunction clearly spells out exactly what kinds of misrepresentations are forbidden, the cases cited by Katz and Levison (Br. 66-68) are readily distinguishable from this case. *SEC v. Goble*, 682 F.3d 934 (11th Cir. 2012), held that an injunction may violate Rule 60(b) where a defendant can only understand his duties by "review[ing] hundreds of pages of the Federal Reporters, law reviews, and treatises." *Id.* at 951. This is not such a case, as the injunction describes the forbidden types of misrepresentations, and the standards governing material misrepresentations have been well-established for decades. *See supra* pp. 24-38. Nor is this case like *LabMD, Inc. v. FTC*, 894 F.3d 1221 (11th Cir. 2018), which vacated an administrative order that "contain[ed] no prohibitions," but "command[ed]" a company "to overhaul and replace its data-security program to meet an indeterminable standard of reasonableness." *Id.* at 1236. The remaining cases involved injunctions that simply tracked the relevant statute with no elaboration.[46]

---

[46] *See SEC v. Smyth*, 420 F.3d 1225, 1233 n.14 (11th Cir. 2005) (order "track[ed] the provisions of the statute or regulation the violation of which [wa]s enjoined"); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1201 (11th Cir. 1999) (injunction forbade "the City from discriminating on the basis of race in its annexation decisions"); *Hughey v. JMS Development Corp.*, 78 F.3d 1523, 1531-32 (11th Cir. 1996) (injunction barred discharges of stormwater "if such discharge would be in violation of the Clean Water Act," and could have been interpreted to require the defendant "to stop the rain from falling"); *Payne v. Travenol Labs., Inc.*, 565 F.2d 895, 897-98 (5th Cir. 1978) (order prohibited "[d]iscriminati[on] on the basis of color, race, or sex in employment practices").

In any event, even if the injunction *had* consisted of a simple ban on material misrepresentations, it still would be valid and lawful.  Under Rule 65(d), the question is "whether the parties subject" to an order "understand their obligations." *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1204 (11th Cir. 2001). "[A]side from concerns about clarity, there is nothing inherently wrong with an injunction that instructs a party to comply with a specific law." *Nat'l Urological I*, 786 F. App'x at 956 n.3 (upholding injunction requiring defendants to possess "competent and reliable scientific evidence").  "[A] broad, but properly drafted injunction, which largely uses the statutory or regulatory language may satisfy the specificity requirement of Rule 65(d) so long as it clearly lets the defendant know what he is ordered to do or not do." *Goble*, 682 F.3d at 952.  As the Ninth Circuit has held when sustaining an injunction against material misrepresentations in an FTC contempt action, such an injunction "is broad, not vague." *EDebitPay*, 695 F.3d at 941, 944.

Here, Katz and Levison do not—and cannot—argue that the injunction's proscription on material misrepresentations deprives them of fair notice.  As noted, the order provides guidance concerning the types of misrepresentations forbidden. And Katz and Levison plainly understood their obligations under the injunction, as Katz negotiated and agreed to the injunction's terms, and Levison was On Point's

General Counsel with responsibility for all "compliance and regulatory matters." OP-DE.470-13 at 12-13, 15.

Finally, Katz and Levison have not refuted the FTC's showing that the 2014 injunction was an appropriate remedy for the violations in the *Acquinity* case. Indeed, Katz and Levison do not argue that the 2014 injunction was overbroad, nor do they challenge the district court's explanation for the injunction's breadth. *See* AQ-DE.174 at 5-6. The injunction was tailored to prevent Katz and his associates from repeating their *Acquinity* violations, which entailed "deceiving consumers into providing them items of value by [falsely] promising that certain products are available to them." *Id*. Here, Katz and Levison engaged in similar bait-and-switch tactics, transferred to a new product. *Id.* The Supreme Court has recognized the "necessity of decrees that are not so narrow as to invite easy evasion," *McComb*, 336 U.S. at 192-93, and has held that proven FTC Act violators may be barred from "similarly illegal practices" in connection with "'any product' they advertise," because wrongdoers "must expect some fencing in," *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 394-95 (1965) (cleaned up). *Accord Nat'l Urological I*, 786 F. App'x at 956. That is precisely what the 2014 injunction did.

### 3.    Katz and Levison Cannot Show That They Made All Reasonable Efforts To Comply

Katz and Levison miss the mark in arguing that contempt was improper because they made good-faith efforts to comply with the *Acquinity* order. Br.30-

32, 68-70.  As a matter of law, "substantial, diligent, or good faith efforts are not enough; the only issue is compliance."  *Leshin I*, 618 F.3d at 1232.  "The absence of wil[l]fulness does not relieve [a contemnor] from civil contempt."  *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1802 (2019) (quoting *McComb*, 336 U.S. at 191).

Although contemnors may have a defense where they have made *all reasonable efforts* to comply, *see PlayNation Play Sys., Inc. v. Velex Corp.*, 939 F.3d 1205, 1213 (11th Cir. 2019), the district court correctly concluded that Katz and Levison have no such defense here.  AQ-DE.225 at 9-10.  This Court has stressed that "*all*" efforts are required, and even "substantial" efforts to comply are insufficient.  *PlayNation*, 939 F.3d at 1214.  Here, Katz and Levison plainly could have complied with the order by telling consumers the truth rather than misleading them through explicit, false promises to perform government services.  And when Katz and Levison learned that consumers were misled, they could have stopped the deception rather than artificially deflating chargeback rates and writing fake customer reviews.  *See supra* pp. 10-11.

Although Katz and Levison tout their supposedly "robust refund policy," Br.69, "a money-back guarantee is not a general defense to a contempt action."  *FTC v. Trudeau*, 579 F.3d 754, 773 n.14 (7th Cir. 2009).  Indeed, this Court has affirmed compensatory contempt-sanctions awards despite "the existence of a full refund policy."  *McGregor v. Chierico*, 206 F.3d 1378, 1388 (11th Cir. 2000).

55

Finally, Katz and Levison claim to have relied on advice from "three top-drawer law firms," *see* Br.30-31, 68, but they concede this "is not a defense to contempt." *Id.* at 69-70. *See, e.g.*, *SEC v. McNamee*, 481 F.3d 451, 456 (7th Cir. 2007) (since "*scienter* is not required in civil-contempt proceedings," "[r]eliance on the advice of counsel … is not a defense"). Even if Katz and Levison's claims were true, they "voluntarily chose" their attorneys and "cannot now avoid the consequences of the acts or omissions" of their "freely selected agent[s]." *Link v. Wabash RR Co.*, 370 U.S. 626, 633-34 (1962). Katz and Levison do not get a free pass from their responsibilities; if they were misled, their "remedy is against the attorney in a suit for malpractice." *Id.* at 634 n.10. Indeed, the corporate contemnors have filed a malpractice suit against their former lawyers to recoup the contempt sanctions (*see* Br.39) and can present their arguments in that proceeding.

### C. The Monetary Sanctions Were Not An Abuse Of Discretion

Even if Katz and Levison's appeal from the monetary sanctions were not waived and moot (*see supra* pp. 41-45), they have failed to show that the court's award of sanctions was an abuse of its "particularly broad" discretion. *See Leshin I*, 618 F.3d at 1232 (cleaned up).

First, Katz and Levison contend (Br.43-50) that the district court was powerless to award compensatory sanctions for the violation of an order issued under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b). But this Court recently

56

rejected this precise argument in *FTC v. National Urological Group, Inc.*, 80 F.4th 1236 (11th Cir. 2023) (*Nat'l Urological II*).  The *National Urological* contemnors argued that because the Supreme Court held in *AMG* that Section 13(b) does not authorize monetary relief, 141 S. Ct. at 1344, a district court may not impose contempt sanctions for violations of an injunction imposed under that statute.  This Court disagreed, holding that a "court's inherent authority to enforce its own orders—including through equitable monetary relief—was unaffected by *AMG*." *Nat'l Urological II*, 80 F.4th at 1242.  "When a district court enters an injunction … under § 13(b)," the court "retains inherent contempt powers to remedy violations of its own orders," and such authority "exists independently of the underlying statute's prescribed remedies."  *Id.* at 1243.  *National Urological II* thus sustained a $40 million contempt judgment and it equally supports affirmance here.

National Urological II* also reiterated that a district court has "extremely broad and flexible" powers when imposing monetary remedies for violations of FTC Act orders.  80 F.4th at 1236 (quoting *FTC v. Leshin*, 719 F.3d 1227, 1231 (11th Cir. 2013) (*Leshin II*)).  "The measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief."  *McComb*, 336 U.S. at 193.

Here, the district court chose to award relief through an opt-in claims process (over the FTC's objections), having concluded that this gave approved claimants a "full monetary recovery." OP-DE.579 at 44. Katz and Levison *endorsed* this remedy, urging the district court to give "full refund[s]," OP-DE.624 at 4, to any consumer who "affirm[s] that he or she was harmed," *id.* at 6. *See also* OP-DE 602 at 4.

In any event, Katz and Levison fail to show any abuse of discretion in the district court's crafting of the contempt sanctions. They assert that the district court failed to deduct business expenses, Br.50-52, but the point of deducting expenses would be to arrive at net profits from the wrongdoing—and the $19.6 million judgment was far less than On Point's net profits. In closing arguments, Katz and Levison told the court that the judgment should be no greater than "**$21,522,411**," which they said reflected the companies' $85 million in gross receipts from the paid-guide sites, minus "expenses, costs, and satisfied consumers." OP-DE.595 at 93-94.

Because the judgment was ultimately $2 million less than what Katz and Levison requested, they "have no basis to complain." *FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 604-05 (9th Cir. 2016). Even if this were not so, the district court correctly explained that it had no obligation to deduct On Point's expenses. OP-DE.579 at 43. The "only" limitation for a contempt-sanctions remedy is that it

"be compensatory." *Leshin II*, 719 F.3d at 1231 (cleaned up). Providing full refunds to victimized consumers is obviously compensatory. Thus, in *McGregor*, this Court sustained a remedy of "damages in the amount of gross sales," since it provided a "fair equivalent" of consumer loss. 206 F.3d at 1388-89. In *Leshin I*, this Court upheld a compensatory-sanctions award of "gross receipts instead of profits," stressing that "[o]ur sister circuits" have held the same. 618 F.3d at 1237 (discussing *FTC v. Kuykendall*, 371 F.3d 745, 766-67 (10th Cir. 2004) (en banc)).[47]

The Supreme Court's decision in *Liu v. SEC*, 140 S. Ct. 1936 (2020), changes nothing, as the district court recognized. AQ-DE.174 at 11. *Liu* held that in an SEC enforcement action under a statute authorizing "equitable relief," 15 U.S.C. § 78u(d)(5), monetary remedies were limited to "net unlawful profits." 140 S. Ct. at 1943-47. *Liu* does not apply to civil contempt remedies, which are not subject to the same limitations.

Rather, the Supreme Court has long held that compensatory-contempt remedies must be based "upon evidence of the complaint's *actual loss*." *United States v. United Mine Workers*, 330 U.S. 258, 303-04 (1947) (emphasis added). In

---

[47] Contrary to Katz and Levison's assertions (Br.49 n.10), it is well established that the FTC has standing to "pursue contempt sanctions for the benefit of injured consumers." *Kuykendall*, 731 F.3d at 753-54.

a deception case, the victim's "actual loss" is the amount she paid based on the misrepresentation; her injuries do not depend on whether the wrongdoer turned a profit. *See, e.g.*, *Trudeau*, 579 F.3d at 771 (explaining that in contempt cases, "consumer loss" may be "a more appropriate measure than ill-gotten gains"). Indeed, this Court has directly confirmed that district courts may impose "*either or both*" an "equitable" or a "legal" remedy for civil contempt, so long as it's compensatory. *Leshin II*, 719 F.3d at 1232 (emphasis added). *Liu* thus does not prevent district courts from giving full refunds to consumers injured by contempt.

Likewise, there is no merit to Katz and Levison's claim that *Liu* precluded the district court from imposing contempt sanctions on a joint-and-several basis. Br.52-53. The argument is baffling, since Katz and Levison have *benefitted* from the sanctions being joint and several: They acknowledge making millions from On Point (Br.53) but are paying $0 because their corporate co-defendants have funded the judgment. *See supra* p. 19.

The joint-and-several award was proper in any event. "Where parties join together to evade a judgment, they become jointly and severally liable for the amount of damages resulting from the contumacious conduct." *Leshin I*, 618 F.3d at 1236-37 (cleaned up). A corporate officer who "was obligated to take appropriate action within his power for the performance of the corporate duty … may appropriately be held jointly liable for the contempt." *Kuykendall*, 371 F.3d

at 759 (cleaned up). Even if *Liu* had applied to civil contempt, *Liu* confirmed that equity permits "collective liability" against "partners engaged in concerted wrongdoing." 140 S. Ct. at 1945, 1949. As the district court held, that is exactly what Katz and Levison were: business partners who controlled and were individually liable for the corporate wrongdoing, OP-DE.528 at 20-22, and who worked in "active concert or participation" to violate the injunction, AQ-DE.225 at 4-6. Katz and Levison have not challenged those rulings, which were the foundation for joint-and-several liability.

Finally, Katz and Levison object to the district court's decision to compensate victims who gave sensitive personal information to On Point's benefit-eligibility sites. Br.53-54. This issue is not just moot (since those victims have been paid), but unfounded. The district court explained that while the benefit-eligibility websites did not take victims' money, they used false pretenses to deprive victims of their "ability to exclusively control and use their personal information." OP-DE.579 at 41. When On Point sold that information to third parties for $17.29 million, this "established on the open market the value of consumers' loss." *Id.* at 41-42. Reimbursing claimants for their individual losses was thus compensatory in nature. *See Leshin II*, 719 F.3d at 1231. Katz and

61

Levison simply ignore the district court's reasoning; they do not contest it and thus cannot establish any error.[48]

## III.    JUDICIAL REASSIGNMENT IS UNWARRANTED

There is no merit to Katz and Levison's allegations that the district court lacked an "appearance of impartiality." Br.73-74. The district court ruled against the FTC on several critical issues, including the claims process, OP-DE.579 at 44; the liability of several defendants, AQ-DE.225 at 7-9, OP-DE.579 at 34, 40; and the FTC's proposed injunctive relief, OP-DE.528 at 27. The only evidence cited by Katz and Levison was the district court judge's comment that he listened to trial testimony "with a lot of skepticism": a comment he made when announcing he was directing judgment in favor of two defendants. OP-DE.594 at 152-53. "[T]he fact that the district judge ruled against the appellants previously is of little impact; otherwise, every reversed case would have to be reassigned on remand." *Stargel v. SunTrust Banks, Inc.*, 791 F.3d 1309, 1312 (11th Cir. 2015).

## CONCLUSION

The judgment of the district court should be affirmed.

---

[48] Katz and Levison claim that the *Acquinity* injunction did not apply to the benefit-eligibility sites because it only covers "misrepresentations regarding a consumer's "obligation to pay." Br.53. This is patently false, as the injunction also bars misstatements based on product characteristics. *See supra* pp. 4-5.

Respectfully submitted,

ANISHA S. DASGUPTA
    *General Counsel*

MARIEL GOETZ
    *Acting Director of Litigation*

October 23, 2023

/s/ *Bradley Grossman*

BRADLEY DAX GROSSMAN
    *Attorney*

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
(202) 326-2994
bgrossman@ftc.gov

Of Counsel:
SARAH WALDROP
SANA CHAUDHRY
CHRISTOPHER ERICKSON
    *Attorneys*

FEDERAL TRADE COMMISSION
    Washington, D.C. 20580

63

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief complies with the volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 12,960 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and that it complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it was prepared using Microsoft Word 365 in 14 point Times New Roman type.

October 23, 2023                    /s/ *Bradley Grossman*
                                    Bradley Grossman
                                    Attorney
                                    Federal Trade Commission
                                    600 Pennsylvania Avenue, N.W.
                                    Washington, D.C.  20580

## CERTIFICATE OF SERVICE

I certify that on October 23, 2023, I served the foregoing brief on counsel of record using the Court's electronic case filing system. All counsel of record are registered ECF filers.

Dated: October 23, 2023

/s/ *Bradley Grossman*
Bradley Grossman
Attorney
Office of the General Counsel
Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-2994
bgrossman@ftc.gov